# United States Court of Appeals
## For the First Circuit

Volume II of II

Nos. 00-1422
     00-1457
     00-1534
     00-1560
     00-1561
     00-1628
     01-1150
     01-1873
     01-2248

UNITED STATES,
Appellee,

v.

MILTON A. NELSON-RODRIGUEZ; LUIS A. ROMERO-LÓPEZ;
MIGUEL A. RODRIGUEZ-RIVERA; EDUARDO ARROYO-MALDONADO;
CARLOS BONET-GONZALEZ; ANGEL CHEVERE-GONZALEZ;
LUIS CARIBE-GARCIA; RAÚL RIVERA-PÉREZ; VICTOR M. VALLE-LASALLE,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
and Shadur,[*] Senior District Judge.

---

[*] Of the Northern District of Illinois, sitting by designation.

Marlene Aponte Cabrera for appellant Nelson-Rodriguez.

Rafael F. Castro Lang for appellant Romero-López.

Jose A. Suarez-Santa for appellant Rodriguez-Rivera.

Raymond L. Sanchez Maceira for appellant Arroyo-Maldonado.

Mauricio Hernandez Arroyo for appellant Bonet-Gonzalez.

Raymond Rivera Esteves for appellant Chevere-Gonzalez.

Marlene Gerdts for appellant Caribe-Garcia.

Linda George for appellant Rivera-Pérez.

Luz M. Rios Rosario for appellant Valle-Lasalle.

William C. Brown, Attorney, U.S. Department of Justice, with whom H.S. Garcia, United States Attorney, was on brief for appellee.

———————————

February 7, 2003

———————————

H.  Apprendi (Nelson, Rodriguez, Arroyo, Bonet, Chevere, Caribe, Rivera, and Valle)

All of the appellants except for Romero, who pled guilty, argue that their sentences were imposed in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000).  Apprendi held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at 2362-63.  The defendants raise several distinct Apprendi claims, and we address each in turn.

1.  Facial Challenge to 21 U.S.C. § 841

The defendants make a facial challenge to 21 U.S.C. § 841.[13] Section 841(a) makes it unlawful for any person to knowingly or intentionally distribute or possess with intent to distribute a controlled substance.  Section 841(b) lists the penalties for violation of section 841(a), which vary depending on the drug type and quantity.  Defendants say this renders the statute facially unconstitutional.

This argument about § 841 is foreclosed by United States v. Collazo-Aponte, 281 F.3d 320 (1st. Cir. 2002), which held that "there is nothing in the statutory language that explicitly defies

---

[13]  The defendants were convicted under 21 U.S.C. § 846, not 21 U.S.C. § 841, but they challenge § 841 because § 846 makes it unlawful to attempt or conspire to commit the offenses listed in § 841.  Therefore, the constitutionality of § 846 is dependent upon the constitutionality of § 841.

Apprendi" because "[t]he statute is silent as to who makes these findings and under what burden of persuasion." Id. at 325. Our decision in Collazo-Aponte is consistent with the decisions of all circuits that have addressed this issue. See, e.g., United States v. Buckland, 289 F.3d 558, 562 (9th Cir. 2002) (en banc); United States v. McAllister, 272 F.3d 228, 232 (4th Cir. 2001); United States v. Brough, 243 F.3d 1078, 1079 (7th Cir.), cert. denied, 534 U.S. 889 (2001).

Collazo-Aponte similarly rejected the claim that § 841(b) includes a mens rea requirement as to the type and quantity of drugs. Section 841(a) requires the defendant to "knowingly or intentionally" possess controlled substances with an intent to distribute. The defendants argue that this mens rea requirement applies to all elements of the crime, including those listed in § 841(b). However, as we held in Collazo-Aponte, "The plain language of § 841(b) requires the government to prove only that the offense 'involved' a particular type and quantity of drugs, not that the defendant knew that he was distributing that particular drug type and quantity." 281 F.3d at 326. The presumption in favor of a scienter requirement does not apply in this case because the elements in § 841(b) only set the penalty and do not criminalize otherwise innocent conduct.

2. Vague Allegations in Indictment

Defendants argue that the indictment was inadequate in that it

made only vague allegations as to the type and quantity of the drugs involved in the conspiracy. It is true that Apprendi considers any fact (other than a prior conviction) that increases the penalty for a crime beyond the statutory maximum to be an element of the crime. But the indictment here easily meets this requirement. The superseding indictment charged that the defendants possessed with intent to distribute over 1,000 kilograms of cocaine, five kilograms of heroin, and 5,000 pounds of marijuana. Furthermore, it provided the drug type and quantity for each of the planned importations at issue at trial, stating for example that Arroyo and Rivera met "two other persons known to the Grand Jury," CIS Hernandez and Diaz, to discuss the importation of approximately 1,200 kilograms of cocaine into Puerto Rico in May 1997, and that Rivera, Torres, and Chevere received a shipment of 250 kilograms of cocaine in July 1997. Such detail is more than sufficient to meet Apprendi's mandate, and we therefore reject defendants' claim.

3. Lack of Jury Determination of Drug Type and Quantity

Defendants argue that their sentences must be vacated because the jury did not determine drug type or quantity. In fact, the jury verdict sheet asked simply whether a particular defendant was guilty of the one count in the indictment, a copy of which was provided to the jury. The indictment charged that the defendants

> did unlawfully, knowingly, willfully, and intentionally combine, conspire, confederate, and agree together with divers

other persons to the Grand Jury known and unknown, to possess with intent to distribute amounts of cocaine, a Schedule II narcotic drug controlled substance, which amounts of cocaine exceeded One Thousand (1,000) kilograms; heroin, a Schedule I, Narcotic Drug Controlled Substance, which amounts of heroin exceeded Five (5) kilograms; <u>and</u> marijuana, a Schedule I controlled substance, which amounts exceeded Five Thousand (5,000) pounds of marijuana

(emphasis added). It also specified particular amounts and kinds of drugs for transactions in which those defendants participated.

We understand the argument to have several parts, including first that the jury, at a minimum, had to decide the drug quantity and type for the underlying conspiracy (to the extent of determining a quantity which sets the maximum sentence under § 841 that would be applicable to the conspirators). The argument moves to another level with the assertion that it was error for the trial judge to deny the requests of several defendants that the jury make an individualized determination as to the drug type and quantity which could be attributed to that defendant. Both arguments have in common the assertion that <u>Apprendi</u> required these issues to be submitted to the jury in light of the fact that the defendants received sentences greater than the default statutory maximum. The relevant default statutory maximum is based on distribution of less than 50 kilograms of marijuana, which produces a maximum sentence of five years for first felony drug convictions and ten years if there is a prior such conviction. 21 U.S.C. § 841(b)(1)(D).

It is common ground, and the government concedes, that the

defendants were entitled to some form of jury determination as to quantity -- whether general or individual is a separate question -- before being subject to more than the default statutory maximum. Here, there was no jury determination of either sort. One might suppose from the indictment quoted above that the jury necessarily found the quantities there specified, but in fact review of the jury instructions confirms that the jury was asked only to determine whether there was a conspiracy as charged, not whether it covered any specific amounts of drugs. The government does not claim otherwise.

However, the jury's failure to determine drug type and amount is not fatal if the evidence overwhelmingly establishes the amount. United States v. Cotton, 535 U.S. 625 (2002). In this instance, our review shows that this is so as to all defendants, whether the test is plain error or harmless error and whether the figure relates to the overall conspiracy or to the individual defendant. We will return to these calculations in due course. But for the sake of future litigation, it is useful to say something more about both the requirements for preservation of Apprendi claims and the problem of general versus specific findings as to amount of drugs. We begin with the latter.

In United States v. Derman, 298 F.3d 34, 42-44 (1st Cir. 2002), this court ruled that it was sufficient to satisfy Apprendi if the jury found that the conspiracy charged was to distribute, or

possess with intent to distribute, a specific quantity (assuming that this figure triggered the higher maximum sentence at issue). If the defendant were convicted of participating in such a conspiracy, this necessarily meant that he was liable, for Apprendi purposes, for the quantity of the overall conspiracy. We therefore held that there was no Apprendi error where a jury

> has determined that the conspiracy involved a type and quantity of drugs sufficient to justify a sentence above the default statutory maximum and has found a particular defendant guilty of participation in the conspiracy[.] [In this situation,] the judge lawfully may determine the drug quantity attributable to that defendant and sentence him accordingly (so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination).

Derman, 298 F.3d at 43.

A number of other circuits have taken the same view as to the issue required to be decided by the jury if the default maximum is to be exceeded. See United States v. Thomas, 274 F.3d 655 (2d Cir. 2001); United States v. Patterson, 241 F.3d 912 (7th Cir. 2001); United States v. Nance, 236 F.3d 820 (7th Cir. 2000). Of course, such a jury determination by itself merely establishes a new statutory maximum under Apprendi; it does not set the defendant's guideline sentence, which will often be less than the statutory maximum and which depends on numerous determinations specific to the individual defendant, including role in the offense, attributed relevant conduct, past criminal history, and the like.

Derman thus answers in this circuit the defendants' claim that

they are entitled under Apprendi to a defendant-specific finding by the jury as to the amount of drugs properly attributed to an individual defendant in a conspiracy case. But we recognize that this is not necessarily the last word on the subject. Conceivably, borrowing from related doctrines, one could construct a foreseeability test of some kind -- attributing to each defendant the amount that the individual agreed upon, actually handled, and reasonably could have foreseen that others would handle -- and could ask the jury by special interrogatories to identify such an amount.

Derman itself involved a relatively simple conspiracy: growing marijuana in an underground greenhouse, first on Derman's property, then on another's. See 298 F.3d at 37. In such cases, it would be a simple matter for the government to indict on the charge that a particular defendant joined an agreement to possess the quantity of drugs grown in the greenhouse, with the intent to distribute that quantity, and to seek a special verdict to that effect. That simple approach may break down for more complex conspiracies involving multiple transactions of different amounts of drugs imported at different times, with a shifting cast of actors. A series of problems implicating sentencing then arises. A particular defendant, for example, may have agreed to import seven kilograms of a drug, but not agreed to import ten, although it was reasonably foreseeable to him that his coconspirators would

import ten.  Or a particular defendant may have gone in and then out of a conspiracy.  See Edwards v. United States, 523 U.S. 511 (1998).  There may be one conspiracy; there may be multiple conspiracies.  Or a defendant may raise Pinkerton issues.  See Pinkerton v. United States, 328 U.S. 640 (1946).  Some of these problems might be solved by more specificity in indictments, by tailored instructions, and by special verdicts.

Such an endeavor would pose issues of its own too numerous to recount in full.  It would implicate the instructions that define conspiracy, itself a tangled subject with built-in tension.  It could also have practical disadvantages for some defendants by compromising later arguments they might otherwise make to the judge concerning the application of the sentencing guidelines.  But Apprendi itself is a recent innovation; it is too early to expect all of its implications to be worked out, and only the Supreme Court can provide final guidance.  It is enough here that Derman provides provisional guidance for the circuit and that the outcome for the defendants in this case would not change even if Derman were overturned.

In explaining this last determination, we consider first the level of review to which each defendant is entitled and then examine separately the evidence bearing on drug quantity attributable to each individual defendant.

a. <u>Preservation of Objection</u>

Valle's appeal raises the question, new to us, of what must be done at trial to preserve an <u>Apprendi</u> objection. Valle was convicted at the second trial, after the <u>Apprendi</u> decision.[14] In our only case holding an <u>Apprendi</u> objection preserved, the objection was raised both at trial and at sentencing. <u>United States</u> v. <u>Bailey</u>, 270 F.3d 83, 88-90 (1st Cir. 2001). <u>Apprendi</u> is primarily about sentencing, but it also has implications for indictment and trial, at least in relation to a sentence which rests on facts which elevate the sentence above the statutory minimum.

For future cases, we think it sufficient if the defendant raises the issue at sentencing. The defendant, of course, has no interest in being sentenced above the maximum and no incentive to request that the jury specifically determine those facts which would carry him above that level. The government, on the other hand, does have an interest in going above the maximum, so it should bear the burden of requesting submission of the issue to the jury. Further, a defendant will not know whether there is an

---

[14] <u>Apprendi</u> was decided on June 26, 2000. We have been asked here to evaluate whether there was <u>Apprendi</u> error in two trials, one of which took place before <u>Apprendi</u> was decided and the other of which began after <u>Apprendi</u>. These cases were indicted in 1998, and the first trial came to verdict in October 1999. Five of the six appellants convicted at this first trial were also sentenced before the <u>Apprendi</u> decision; Caribe, the sixth, was sentenced on December 15, 2000. Valle and Rivera were convicted at the second trial, which began in September 2000, after <u>Apprendi</u>.

_Apprendi_ error until sentencing, and then only if the court considers a sentence above the maximum. An objection from defendant at the point of sentencing will be timely.

Rivera requested before the jury was charged that the district court submit the question of drug quantity and type to the jury in a special verdict. Valle joined in this initial objection. Rivera renewed his objection at sentencing, but Valle did not. The government argues that Valle waived his _Apprendi_ claim by failing to renew his objection after the jury was charged or at sentencing. The district court denied Rivera and Valle's request, presumably because this court had not yet held that _Apprendi_ applied to § 846 prosecutions; under prior circuit law, the drug quantity and type determination for sentencing purposes was for the judge to decide. _See, e.g._, _United States_ v. _Lindia_, 82 F.3d 1154, 1160-61 (1st Cir. 1996). It was not until January 2, 2001, some three months after the trial judge acted here, that this circuit decided that _Apprendi_ applied to §§ 841 and 846. _United States_ v. _Baltas_, 236 F.3d 27, 40-41 (1st Cir. 2001).

Thus, this case may be viewed as a transition case to a new post-_Apprendi_ regime, before this court applied _Apprendi_ to prosecutions under §§ 841 and 846. In this transition context, where the defendant did raise the issue and ask for a special verdict, we have sympathy for the argument that this is enough to preserve the _Apprendi_ objection. Still, given _Bousley_ v. _United_

-64-

<u>States</u>, 523 U.S. 614 (1998), the waiver analysis is very complicated and we prefer to assume rather than decide that the issue was preserved in these circumstances.

b. <u>Valle</u>

Valle's sentence of 360 months exceeds the default statutory maximum for cocaine offenses of twenty years and so raises a valid claim of <u>Apprendi</u> error.

The jury found Valle guilty beyond a reasonable doubt of participating in a drug conspiracy. The only transaction in which Valle was alleged to be a participant was the planned importation of 1,100 kilograms of cocaine in the summer of 1997. Therefore the jury must have found that Valle participated in this transaction. The only issue is the type and amount of drugs involved in this transaction, an issue that appears to have been undisputed at trial. <u>See, e.g.</u>, <u>United States</u> v. <u>Swatzie</u>, 228 F.3d 1278, 1283 (11th Cir. 2000) (affirming where there was no evidentiary basis for the jury to find that the defendant had possessed cocaine with intent to distribute but that the quantity of cocaine involved was less than five grams).

CI Hernandez testified on direct examination at the second trial that the transaction involved 1,100 kilograms of cocaine. CI Diaz also testified that the transaction was to involve between 1,000 and 1,200 kilograms of cocaine. The drug type and quantity was not the subject of any questions on cross-examination; indeed,

-65-

defense counsels' questions appear to take the drug type and quantity as a given. Nor did defense counsel raise the issue in closing arguments. Finally, Valle does not point to any evidence on appeal that would cast doubt on the alleged drug type or quantity involved in this transaction. See, e.g., United States v. Martinez-Medina, 279 F.3d 105, 122 (1st Cir. 2002) (dismissing defendants' Apprendi claims under harmless error review in part because neither defendant seriously denied that the conspiracy involved at least five kilograms of cocaine). We thus conclude that the Apprendi error as to Valle was harmless.

c. Rivera

Any Apprendi error against Rivera was also harmless. Rivera was sentenced to life imprisonment, while the default statutory maximum for a defendant with a prior felony drug conviction (such as Rivera) is ten years. The government concedes that Rivera preserved his Apprendi claim because he raised it at trial and at sentencing. The only issue, therefore, is whether the jury must have found Rivera guilty of conspiring to possess at least half a kilogram of cocaine with an intent to distribute. The trial judge can sentence a defendant with a prior felony drug conviction to life imprisonment based on that amount of cocaine. See 21 U.S.C. § 841(b)(1)(B).

At trial, the government produced overwhelming evidence that the transactions in which Rivera participated involved at least

half a kilogram of cocaine.  CI Hernandez and CI Diaz testified as to the amounts involved in two planned cocaine importations of 1,100 kilograms and 700 kilograms.  Torres, the cooperating defendant, testified that Rivera was involved in the successful importation of 250 kilograms of cocaine.  Their testimony was supported by evidence from wiretaps and other surveillance.  Rivera's counsel did not contest the type or amount of drugs involved in any of these importations at trial.  Rivera argues on appeal that the jury could not have been sure of the drug type or quantity involved because these were "dry" conspiracies, which means that the government did not seize any drugs.  The amount of the drugs was clear, nonetheless.  There is simply no serious argument that the jury could have convicted Rivera believing that he participated in a conspiracy involving less than half a kilogram of cocaine.

Rivera also relies on our decision in Collazo-Aponte to argue that an Apprendi error can never be harmless.  That case does not stand for this proposition.  The defendant in Collazo-Aponte did not preserve his Apprendi error at trial, which means that this court normally would have reviewed his claim under plain error review and, as part of that inquiry, examined the evidence against him.  We did not do so, however, because the government conceded that the error was plain.  Collazo-Aponte, 281 F.3d at 324.  Thus there was no reason for the court to go through the plain error

-67-

analysis.  Had the government not made this concession, we would have reviewed the evidence presented at trial to determine whether the defendant's <u>Apprendi</u> claim survived plain error review.

d.  <u>Arroyo</u>

Arroyo's sentence of 324 months was also contrary to <u>Apprendi</u> because it exceeded the ten-year default statutory maximum for prior offenders.  Arroyo did not raise an <u>Apprendi</u> claim before the district court, and review is for plain error.  Arroyo, who was replaced as Rivera's lieutenant when he demanded a million dollars, was connected only to the first planned importation, involving 1,100 kilograms of cocaine.  The jury could have convicted him only on this basis.  Arroyo did not dispute at trial the drug type or amount involved in this planned importation, nor does he dispute these facts on appeal.  Moreover, no jury could have failed to find beyond a reasonable doubt that the conspiracy involved some amount of cocaine, triggering a maximum sentence of thirty years.  CI Hernandez testified in great detail about their plans to import 1,100 kilograms of cocaine, and CI Diaz testified to some of the same facts.  There was no plain error.

e.  <u>Caribe</u>

We review Caribe's <u>Apprendi</u> claim for harmless error because he raised the claim at sentencing.  Caribe was sentenced to 420 months, which was above the applicable five-year statutory maximum. This sentence would be authorized by 21 U.S.C. § 841(b)(1)(B) if

the conspiracy involved at least half a kilogram of cocaine or more than 100 kilograms of marijuana. Caribe argues that the error was not harmless because the evidence linking him to the drug conspiracy was slim and relied primarily on the testimony of government informants of dubious credibility. The evidence against Caribe was much stronger than his re-telling of it; but he has simply focused on the wrong target. The jury did convict him of conspiring to possess drugs with an intent to distribute them; the only remaining issue is the type and quantity of the drugs involved.

The jury could not have convicted Caribe without finding that he was involved in the conspiracy's final planned importation. Caribe did not dispute the type or quantity of drugs involved in that plan at trial and does not do so on appeal. CI Diaz testified that the importation involved 700 kilograms of drugs. There is less evidence about the type of drugs involved. Diaz testified only that there were "700 kilos" involved; he never explicitly said what type of drugs the conspirators planned to import, although one question during his cross-examination referred to cocaine, and he did not correct defense counsel. Nonetheless, it does not matter for Apprendi purposes what type of drug was involved. The only drugs charged in the indictment were cocaine, heroin, and marijuana. Under § 841(b)(1)(B), Caribe's sentence was permissible regardless of what type of drugs were involved, as long as the

conspiracy involved at least 700 kilograms of any of these types of drugs.

f. <u>Bonet</u>

Bonet's sentence of 360 months was contrary to <u>Apprendi</u> because it exceeded the ten-year default statutory maximum for prior offenders. His sentence would be valid under 21 U.S.C. § 841(b)(1)(D) as long as he conspired to possess with intent to distribute any amount of cocaine or at least fifty grams of marijuana. He argues that we should review his claim for harmless error because his co-defendant Nelson made an <u>Apprendi</u> objection. However, the trial judge required each defense counsel to make their own objections, and Bonet's counsel did not join in Nelson's <u>Apprendi</u> objection. We review Bonet's claim for plain error.

Like Caribe, the evidence tied Bonet to the conspiracy's final planned importation in the fall of 1997. The same analysis that applied to Caribe also applies to Bonet: there was overwhelming evidence of a quantity of "700 kilos," and that quantity of drugs is sufficient to justify his sentence regardless of whether the type of narcotic was cocaine, heroin, or marijuana. <u>See</u> 21 U.S.C. § 841(b)(1)(B).

g. <u>Nelson</u>

Nelson's sentence of 293 months raises a potential <u>Apprendi</u> issue because it exceeded the ten-year default statutory maximum for prior offenders. His sentence would be permissible if the

conspiracy involved at least 50 kilograms of marijuana or any amount of cocaine. See 21 U.S.C. § 841(b)(1)(D). Nelson made an Apprendi objection only during trial; we review his claim for harmless error.

The primary evidence against Nelson at trial concerned the planned importations of 36 kilograms of cocaine and approximately 6,000 pounds of marijuana. The jury could not have convicted Nelson without finding that he was involved in at least one of these ventures. The Apprendi error was harmless because evidence establishing the amount and type of drugs involved in both of these plans was overwhelming and undisputed at trial. CI Hernandez and cooperating defendant Torres both testified that Nelson had attempted to bring 36 kilograms of cocaine into Puerto Rico. There was some dispute as to Nelson's motivations for participating in the transaction, but he never disputed the type or quantity of drugs involved. As to marijuana, the government at trial played a recording of a conversation between Rivera and Nelson in which they discussed importing 6,000 pounds of marijuana. Nelson offered no evidence to rebut this point, and at sentencing did not dispute the contention that the plan involved 6,000 pounds of marijuana.

h. Chevere

Chevere's sentence of 540 months raised a potential Apprendi issue because it exceeded the five-year default statutory maximum. The sentence would be permissible under 21 U.S.C. § 841(b)(1)(A) as

long as he was involved in a conspiracy involving at least five kilograms of cocaine or 1,000 kilograms of marijuana. Chevere argues that his claim should be reviewed for harmless error because he says his counsel raised an Apprendi claim at sentencing. The transcript of his sentencing hearing shows that his counsel challenged only Chevere's involvement in the conspiracy and the base level calculation, not the amount or type of drugs. We review his claim for plain error.

Although there was not evidence that Chevere conspired to import marijuana, the evidence did tie him to the successful importation of 250 kilograms of cocaine. Torres, the cooperating defendant, testified that Chevere was in charge of security for that importation. There was no dispute about the type or quantity of drugs involved. Torres was directly involved in the importation and testified that he and the other conspirators imported 250 kilograms of cocaine. He described in detail how he and Rivera split the load and how Rivera planned to send his share to New York for distribution. CI Hernandez also testified that Rivera told him that he successfully imported 250 kilograms of cocaine into Puerto Rico.

Chevere claims that the transaction never took place despite Torres and Hernandez's testimony to the contrary. To support this claim, he points to the fact that the FBI, which had Rivera's organization under surveillance, did not see the delivery of

cocaine. However, the jury necessarily found that the transaction did occur, whether or not it was observed by investigators directly. There was no evidence that this importation involved a smaller amount of cocaine.

i. Rodriguez

Rodriguez's sentence of 151 months was contrary to Apprendi because it exceeded the default statutory maximum of five years. The sentence would be permissible as long as Rodriguez participated in a conspiracy involving any amount of cocaine. We review his claim for plain error because he did not raise it at trial.

The only evidence at trial relating to Rodriguez tied him to the successful importation of 250 kilograms of cocaine. Taped telephone conversations played at trial showed that Rodriguez delivered the cocaine imported in that transaction to New York, where it was distributed by Figueroa, Caribe's brother-in-law. The jury could not have convicted Rodriguez without believing that he was involved in this aspect of the conspiracy. The amount and type of drugs in the successful importation were undisputed at trial, and thus we reject Rodriguez's Apprendi claim.

I. Substantial Assistance Departure (Romero)

Romero pled guilty and presents one issue, a sentencing issue, on his appeal. He argues that the sole reason the government failed to move that he be given a Section 5K1.1 sentence reduction for substantial assistance was an impermissible one: it was in

retaliation for his telling the truth in his third debriefing, a truth which was exculpatory as to codefendant Ortiz.

U.S.S.G. § 5K1.1 provides: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." See also 18 U.S.C. § 3553(e) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense."). Romero's plea agreement stated that "[t]he United States reserves its option to seek any departure from the applicable sentencing guidelines, pursuant to Section 5K1.1 . . . if in its discretion the United States determines that such a departure is appropriate." The agreement further specified that "[t]he defendant agrees that the decision whether to file such motion rests in the sole discretion of the United States."

The district court, after hearing proffers from both counsel, rejected the argument and declined to take testimony from Agent Plichta, who conducted the debriefings at issue here. Romero argued that there was error in not holding an evidentiary hearing and in not compelling the government to file such a motion.

Our review of questions of law is de novo; our review of the

fact-based conclusion of the district court as to the substantial assistance question is for clear error.  See United States v. Doe, 233 F.3d 642, 643-44 (1st Cir 2000).

Implicit in the question presented is an issue of law: assuming Romero's claims were true, whether it is permissible for the government to decline to seek a substantial assistance departure in retaliation for a cooperating defendant's truthful disclosure of exculpatory information about codefendants.  In this area, the government acts under two constraints.  First, the law is clear that the government may not base its decision on an unconstitutional motive, such as racial prejudice.  See Wade v. United States, 504 U.S. 181, 185-86 (1992).  Second, because the government entered into a plea agreement with Romero, it had to carry out in good faith the obligations it assumed under the agreement.  See United States v. Alegria, 192 F.3d 179, 186-87 (1st Cir. 1999); see also United States v. Davis, 247 F.3d 322, 325 (1st Cir. 2001).  This good-faith requirement applies even though the plea agreement specifies that the "government retains absolute discretion with respect to the filing of a section 5K1.1 motion." Alegria, 192 F.3d at 186-87.

Whether viewed as part of the Wade obligation or the Alegria obligation, the government may not base its refusal to seek a substantial assistance departure on a defendant's truthful disclosure of exculpatory information.  We can think of few things

more corrosive to the criminal justice system than prosecutorial retaliation against a witness for telling the truth.  If these were the government's grounds, they would both be impermissible and have no rational relationship to a legitimate government end.  Cf. Davis, 247 F.3d at 326.

The district court held that Romero had not made a threshold showing of improper motivation by the government.  See Alegria, 192 F.3d at 187.  In explaining to the district court its reasons for not filing a Section 5K1.1 motion, the government used language that was likely to arouse suspicion.  It complained that, because of Romero's statements and writings produced at the third of his four debriefings, the prosecution was forced to provide defense counsel with Brady and Jencks material.  Appropriately concerned by these statements, the district judge investigated further and took proffers from both counsel.

In the end, the district court was satisfied that the government had reason to think Romero was not truthful at the last two debriefings and, while he had given assistance, he had not given substantial assistance. Romero's untruthfulness was shown by the fact that he did not disclose certain information helpful to Ortiz and Nelson until his third debriefing, and that this newly-disclosed information appeared to be inconsistent with information provided by another cooperating witness. As the trial judge noted, the government had told the court it intended to use Romero as a

prosecution witness at trial but then did not do so. This decision not to call Romero as a witness was entirely consistent with the government's view, expressed at sentencing, that Romero was not truthful. And, as the district court aptly noted, substantial assistance is a higher standard for a defendant to meet than mere cooperation. Romero's failure to be forthcoming in earlier debriefings evidenced his failure to meet this higher standard.

When faced with such Section 5K1.1 claims where there is a plea agreement, the government bears the modest burden of production, not persuasion. Alegria, 192 F.3d at 187. The government must offer "facially adequate reasons." Id. at 188. It did so here. The judge, who sat through a lengthy trial and inquired into this matter, found nothing impermissible about the government's reasons for declining to seek a substantial assistance departure. Given the judge's extensive exploration of the issue with counsel, no separate evidentiary hearing was required.

J. Supervised Release Terms (Bonet and Rodriguez)

Bonet and Rodriguez challenge the length of their terms of supervised release. The district judge sentenced Bonet to twenty years of supervised release and Rodriguez to fifteen years. Both defendants claim that these terms were invalid because they were disproportionately longer as a percentage of their total years of imprisonment than their codefendants' terms. This argument is foreclosed by 18 U.S.C. § 3742(a), which establishes the limited

circumstances in which a defendant can seek review of his sentence. As the Seventh Circuit held in United States v. Rios-Calderon, 80 F.3d 194, 198 (7th Cir. 1996), "nothing in § 3742(a) allows review of a sentence imposed in conformity with the Guidelines on the ground that a codefendant was treated differently." See also United States v. Youngpeter, 986 F.2d 349, 356 (10th Cir. 1993) ("Sentencing differences due to individual conduct as considered by the Sentencing Guidelines does not make a sentence disproportionate.").

Rodriguez also argues that his supervised release term is barred by U.S.S.G. § 5D1.2. We note at the outset that this claim was nearly forfeited because of the skeletal manner in which it was raised. See Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998) (claim is forfeited if it is raised in a perfunctory manner unaccompanied by developed argumentation). But we will give Rodriguez the benefit of the doubt and find that the claim was not forfeited. Rodriguez's counsel also failed to object to the length of the supervised release term at sentencing, which would normally mean that his claim could be reviewed only for plain error. But we will again give Rodriguez the benefit of the doubt because he was not given advance notice in the presentence report or by the judge or prosecutor that he could be sentenced to more than five years of supervised release, the maximum term specified in the guidelines.

We now turn to the merits of Rodriguez's claim. U.S.S.G. § 5D1.2 states that supervised release terms for Class A or B felonies shall be "at least three years but not more than five years." The relevant statute, 21 U.S.C. § 841(b)(1)(A), provides that the defendant shall be sentenced to a term of supervised release of "at least five years." This court's recent decision in United States v. Cortes-Claudio held that these provisions should be read together to mean that a defendant convicted under 21 U.S.C. § 841(b)(1)(A) can be sentenced to only five years of supervised release unless the judge makes a permissible upward departure from the guidelines. 312 F.3d 17, 18-19 (1st Cir. 2002). The judge can make such a departure if he finds that there are aggravating circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission," and if the parties are given advance notice that the judge is contemplating making such a departure and of the grounds on which the judge is contemplating departing. Id. at 24; see also United States v. Burns, 501 U.S. 129, 138-39 (1991).

The district judge in this case did not anticipate this court's decision in Cortes-Claudio and mistakenly concluded that the guidelines did not apply to the length of a supervised release term imposed under 21 U.S.C. § 841. Thus he did not give the parties notice of a possible upward departure or make the required findings of aggravating circumstances to support the departure. We

accordingly vacate Rodriguez's fifteen-year supervised release term and remand to the district court for re-sentencing as to the length of the term of supervised release. On remand, should the district court find that there are aggravating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission, it must still give the parties advance notice that it is contemplating departing and the grounds of the possible departure and give them an opportunity to respond.

K.  Other Sentencing Guidelines Issues

   1. Drug quantities (Caribe, Bonet, Valle, Chevere, Arroyo, Nelson, Rodriguez)

In sentencing, the district court took into account the amount of drugs that could be attributed to each defendant. Several defendants challenge these determinations, which are distinct from claims that the determination of quantity by the judge rather than the jury violated Apprendi.[15] We review the trial court's factual determinations at sentencing for clear error. United States v. Damon, 127 F.3d 139, 141 (1st Cir. 1997). Legal interpretations of the sentencing guidelines are reviewed de novo. United States v.

---

[15] As we noted above, Apprendi only requires the jury to determine the drug type and quantity involved in the conspiracy. After the jury has made this determination, the judge can make individualized determinations about the amount of drugs attributable to each defendant. Even though the jury did not make its initial determination, we found no reversible error as to any defendant, so that the judge could still determine the amount of drug attributable to each defendant.

<u>Ranney</u>, 298 F.3d 74, 80 (1st Cir. 2002).

　　a.　<u>Caribe</u>

Caribe argues that the court erred in setting his base offense level at 38, which is applicable to a quantity of 150 kilograms or more of cocaine. The court set the base offense level after determining that 745 kilograms of cocaine could be attributed to Caribe. The court held that Caribe was directly involved in the conspiracy to import 700 kilograms of cocaine in the fall of 1997. This determination was consistent with the testimony of CI Diaz, who testified that Caribe was a key player in several meetings to plan the details of this importation. It also attributed to Caribe 45 kilograms of cocaine out of the successful 250 kilogram importation, which he sent to his brother-in-law in New York for distribution. Torres had testified that Caribe was in charge of moving some amount of cocaine up to New York, and that he believed the amount to be "about forty-five" kilograms. It was not clear error for the court to conclude that Caribe was responsible, at least in part, for distributing 45 kilograms of cocaine. This total quantity of 745 kilograms of cocaine supports the court's decision to set Caribe's base offense level at 38.

　　b.　<u>Bonet</u>

The court found Bonet responsible for at least 150 kilograms of cocaine, based on Bonet's involvement with the planned importation of 700 kilograms of cocaine. This determination was

not clear error considering Bonet's role in planning this importation.

Bonet argues that the court should have reduced the amount of cocaine attributed to the defendants because of the intensive involvement of CIS Hernandez and Diaz in the conspiracy. This is a type of improper sentencing factor manipulation argument, for which Bonet has the burden. As stated in United States v. Montoya, "garden variety manipulation claims are largely a waste of time." 62 F.3d 1, 4 (1st Cir. 1995). It is insufficient to say that the idea of the conspiracy originated with undercover agents, or that conduct was encouraged by the government, or that the crime exceeded in degree or kind what the defendant had done before. Instead the defendant must show that elements like these were so extensive that "the government's conduct must be viewed as extraordinary misconduct." Id. (internal quotations omitted). This standard is high in part because the defendant has the opportunity to raise an entrapment defense at trial.

Bonet has fallen far short of this standard; he offers nothing more than conclusory allegations. Furthermore, Hernandez testified that the Colombians, not he or Diaz, set the amount involved in the cocaine importations. For example, in the 700 kilogram importation, Hernandez testified that the Colombians wanted the organization to import 700 kilograms of cocaine as a test to determine whether its members had the capability to import larger

quantities of drugs in the future.  Bonet also bragged to Diaz that he and his team had been drug trafficking for years.  It is unlikely, therefore, that government agents encouraged Bonet or his coconspirators to engage in conduct in which they would otherwise have been unwilling to participate.

   c.  <u>Valle</u>

Valle argues that the judge erred in attributing at least 150 kilograms of cocaine to him.  He did not raise this claim at sentencing, and therefore it is waived.  <u>United States</u> v. <u>Shattuck</u>, 961 F.2d 1012, 1015 (1st Cir. 1992) ("We do not review sentencing guideline disputes which were not preserved before the district court.").  We have discretion to review waived guidelines claims in "horrendous cases where a gross miscarriage of justice would occur."  <u>United States</u> v. <u>Haggert</u>, 980 F.2d 8, 11 (1st Cir. 1992).  This is not one of those cases.  The evidence overwhelmingly tied Valle to the planned importation of 1,100 kilograms of drugs.  CI Hernandez testified extensively about Valle's involvement in this transaction and the amount and type of drugs involved.

   d.  <u>Chevere</u>

Chevere argues that the district court erred in finding that he was involved in the importation of 250 kilograms of cocaine.  Torres testified that Chevere was in charge of security for this successful transaction.  Chevere argues that the district court should not have used this transaction to set Chevere's base offense

level, because an FBI agent who was watching the delivery location testified that he did not actually see the drugs being delivered. Whether the FBI agent saw it or not, there was ample additional evidence at trial that the transaction took place, and that Chevere was involved in it.  There was no clear error.

e.  Arroyo

Arroyo argues error in the attribution of 1,200 kilograms of cocaine to him because the government did not show that he had the capability to transport such a large amount of cocaine.  Arroyo argues that the government never proved that Arroyo owned a boat that could be used to bring the cocaine to Puerto Rico.  Under the sentencing guidelines, if a planned drug transaction does not take place, the sentencing court should base the defendant's drug-quantity finding on the negotiated amount of drugs, in this case 1,200 kilograms. See U.S.S.G. § 2D1.1, cmt. n.12.  However, the court can use a lower amount if "the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance." Id.  Thus the burden is on Arroyo to show that he was not capable of transporting 1,200 kilograms of cocaine.  Arroyo has not met his burden in this case and there was no clear error.

f.  Nelson

Nelson argues that the district court erred in attributing 99.5 kilograms of cocaine to him.  The court found that he was

involved in the successful importation of 250 kilograms of cocaine and had a role in distributing 50 kilograms from that shipment. Torres testified that Rivera gave Nelson some unknown percentage of Rivera's own share of the cocaine from this shipment. Rivera also gave a percentage of his share to Caribe and to Chevere, but Torres did not know exactly how much each of the three defendants received; he only knew that together they received 50 kilograms. Nelson and Rivera, in recorded conversations, discussed the price at which they would be able to sell the cocaine. The court also found that he had a role in the attempted importation of 36 kilograms of cocaine and the transaction involving 6,000 pounds of marijuana. It also could have based its overall findings on Nelson's more general involvement in distributing Rivera's share of the cocaine. We see no clear error in the court's conclusion.

g. Rodriguez

Rodriguez argues that the district court erred in determining that his base offense level was 34, which is applicable when the judge attributes at least 15 kilograms of cocaine to the defendant. The government alleged that Rodriguez was involved in delivering to Figueroa in New York approximately 45 kilograms of cocaine from the 250 kilogram shipment. The government introduced taped conversations in which Rivera told Figueroa that he had arranged for someone to deliver the cocaine to Figueroa. The day before, Rodriguez had flown to New York from San Juan. The government also

introduced a recording of a conversation in which Rodriguez and Rivera discussed the price of cocaine. At trial, Rodriguez disputed that he had been involved in the cocaine delivery, but the jury could not have convicted Rodriguez otherwise. The only remaining issue is the amount of drugs that Rodriguez brought to New York; Torres testified that Rivera sent "about 45" kilograms there. It was not clear error for the judge to attribute at least fifteen of those kilograms of cocaine to Rodriguez.

2. Minor Participant Adjustment (Bonet)

Bonet argues that the court erred in not granting him a two-level reduction under U.S.S.G. § 3B1.2(b) for being a minor participant in the conspiracy. The commentary to this section states that "a minor participant means any participant who is less capable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b) cmt. n.5. In seeking a § 3B1.2 adjustment, a defendant "has the burden of proving that he is both less culpable than most others involved in the offense of conviction and less culpable than most other miscreants convicted of comparable crimes." United States v. Ortiz-Santiago, 211 F.3d 146, 149 (1st Cir. 2000). The court did not err in refusing to grant this adjustment. The testimony at trial showed that Bonet participated in several of the meetings in which the conspirators planned the importation of 700 kilograms of cocaine. Bonet was also responsible for testing the radio equipment that

would be used.  Finally, Bonet told CI Diaz that he had been part of Rivera's drug trafficking team for many years.  It was entirely reasonable to conclude that Bonet was no minor participant.

3.  <u>Special Skills Enhancements (Valle and Bonet)</u>

Section 3B1.3 of the sentencing guidelines provides that the district court can increase the offense level two levels if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  The commentary to this section states, "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3 cmt. n.3.  We review the district court's legal interpretation of the term "special skill" de novo and its factual application for clear error.  <u>United States</u> v. <u>Noah</u>, 130 F.3d 490, 499 (1st Cir. 1997).

The district court increased Valle's offense level by two levels because it found that Valle was going to be the boat captain for the first planned importation of 1,100 kilograms of cocaine, thus exercising a special skill.  Valle did not object to this enhancement at his sentencing hearing, and therefore he waived the claim.  <u>Haggert</u>, 980 F.2d at 10-11.  Even if this claim were not waived, the record amply supports the determination.

The district court enhanced Bonet's offense level by two

levels because it found that his coconspirators were "counting on his skills as a person knowledgeable with communication equipment." The record establishes that Bonet had a special skill. CI Diaz testified that on October 30, 1997, Bonet conducted a test of the 20/40 radio that the conspirators were planning to use to communicate with the Colombians in order to complete the planned importation of 700 kilograms of cocaine. A 20/40 radio is one that can be used to communicate with any part of the world. Bonet showed Diaz the antenna he had put on a tree outside his house. Bonet then set up the radio and tried to contact the Colombians; unbeknownst to him, the transmission was intercepted by the FBI. Bonet conducted the test over high and low frequency channels and had given the Colombians the same list of frequencies so that the two groups could communicate. This evidence shows that Bonet had a special skill within the meaning of § 3B1.3. Accord United States v. Malgoza, 2 F.3d 1107, 1110 (11th Cir. 1993) (term "special skills" applies to an "advanced level of radio operating ability").

A defendant does not need to have formal education or professional stature to have a special skill within the meaning of § 3B1.3. Noah, 130 F.3d at 500. Instead "a special skill can be derived from experience or from self-tutelage." Id. Nonetheless, the defendant must possess skills that members of the general public would not have. Bonet's knowledge was more extensive than

merely turning on a radio and speaking; he also knew how to assemble the radio and its antenna and understood how to determine and locate the frequencies necessary to communicate with the Colombians.

The issue remains whether Bonet's skill "significantly facilitated the commission . . . of the offense." U.S.S.G. § 3B1.3. Diaz did not testify that Bonet would be the person operating the radios on the day the shipment was delivered. Two reasonable inferences support a determination that Bonet's special skill substantially facilitated commission of the crime. We review both possible determinations for clear error.

First, Bonet's radio test in and of itself aided the conspiracy. He was responsible for making sure that Rivera's organization had the necessary radio equipment to handle such a large importation of drugs. The Colombians would not be willing to entrust Rivera's organization with the shipment if it could not make this showing. Even though Bonet was unable to contact the Colombians during his radio test, it did show Diaz (who, as an intermediary, acted as the Colombians' representative) that Rivera's organization had at least some of the necessary equipment and skills.

Second, an inference that Bonet would be the one operating the radios the day of the shipment could not be clear error. Bonet played an integral part in the meetings. He told Diaz that he was

skilled as a boat captain, but that he would not be the boat captain for this shipment. Bonet argues that he never got a chance to use his special skills to the full extent contemplated by his conspirators. However, U.S.S.G. § 2X1.1(a) also covers intended offense conduct that can be established with "reasonable certainty." It was not clear error to conclude with reasonable certainty that Bonet intended to use his special skill to facilitate the crime. See United States v. Downing, 297 F.3d 52, 65 (2d Cir. 2002).

4. Firearm Enhancement (Caribe)

The district court increased Caribe's offense level by two levels because the court determined that Rivera had a weapon in Caribe's presence during part of the planning of the 700 kilogram importation. U.S.S.G. § 2D1.1(b)(1) provides that the judge can increase the offense level by two levels "if a dangerous weapon (including a firearm) was possessed." The comment to this section states that the enhancement applies if a weapon was present, unless it is clearly improbable that the weapon was connected with the offense. See U.S.S.G. § 2D1.1(b)(1), cmt. n.3.

The judge found that Caribe was present when Rivera gave CI Diaz a gun to give to CI Hernandez. Diaz testified that he met with Caribe and Rivera on August 16, 1997. At the end of the meeting, Rivera gave Diaz a gun that he asked Diaz to give to Hernandez. Rivera told Diaz that Hernandez could use the gun if he

-90-

had to because it was "clean." Caribe claims that he left the meeting before Rivera gave Diaz the gun, but this claim is not supported by the record. Caribe was the last person to arrive at the meeting, but Rivera gave Diaz the gun at the end of the meeting as they were saying good-bye. It was not clear error for the judge to determine that Caribe remained at the meeting at this point.

Caribe next argues that the government did not establish the required nexus between the gun and the conspiracy. The prosecution must show that the defendant (or in a conspiracy case, one of his coconspirators) possessed a weapon during the offense. United States v. McDonald, 121 F.3d 7, 10 (1st Cir. 1997); United States v. Thornton, 306 F.3d 1355, 1358 (3rd Cir. 2002). The prosecution does not have to show that the defendant or his coconspirators actually used the gun in perpetrating the offense or intended to do so. McDonald, 121 F.3d at 10. Once the prosecution has made this showing, the burden shifts to the defendant to establish that a connection between the weapon and the crime was clearly improbable. Id. Caribe argues that the prosecution did not make its required showing because it relied on the uncorroborated testimony of CI Diaz. It is routine, and certainly not clear error, for the trial judge to credit a witness's testimony in making sentencing determinations, even if the testimony is not corroborated by other evidence. Nor did the judge err in determining that Caribe's coconspirator possessed the gun in connection with the conspiracy.

-91-

5. Leadership Enhancement (Caribe)

Caribe next argues that the court erred in increasing his offense level by three levels after determining that Caribe was a manager or supervisor in the organization. Section 3B1.1(b) permits the court to enhance the sentence if "the defendant was manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." The court based its determination on CI Diaz's testimony about Caribe's role in planning the importation of 700 kilograms of cocaine in the fall of 1997. For example, Diaz testified that Caribe "controlled all of the beaches and the group from Humacao, including the captain and the boats." Caribe also told Diaz that Ortiz, who was supposed to captain the boat that would bring the drugs into Puerto Rico, worked for him. According to Diaz, Caribe said that "they [Rivera and Caribe] had the captains, the boats, and the personnel that was needed to carry out the job." This evidence is sufficient to support the court's determination.

6. Downward Departure Requests (Valle and Nelson)

The district court denied motions by Valle and Nelson for downward departures in their sentences. Valle argues that the district judge abused his discretion by failing to depart from the sentencing guidelines because of a claimed disparity between his sentence and the sentence of some of his coconspirators. The

argument fails; a court cannot depart from the sentencing guidelines in order to correct a disparity between the sentences of coconspirators. See United States v. Ortiz-Santiago, 211 F.3d 146, 150 (1st Cir. 2000) ("Disparity in sentencing amongst coconspirators, without more, is not enough to justify a downward departure.").[16] Nelson argues for a downward departure based on his necessity defense that he participated in the conspiracy only to save his kidnapped nephew. This was committed to the non-reviewable discretion of the district court. See United States v. Romero, 32 F.3d 641, 653 (1st Cir. 1994).

L. Procedural Errors at Sentencing (Caribe)

1. Right to Speedy Sentencing

Caribe claims that his right to a fair trial was violated because of excessive delay in his sentencing. Caribe was convicted on October 1, 1999. All objections to the Presentence Investigation Report were submitted by April 25, 2000, but he was not sentenced until December 15, 2000. Thus, over fourteen months passed between the date of conviction and the date of sentencing.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Supreme Court has not

---

[16] It is far from clear that there was any disparity. Valle's sentence of 360 months was greater than four coconspirators' sentences and equal to or less than four other coconspirators' sentences.

definitively held that this right extends to the sentencing phase. See Pollard v. United States, 352 U.S. 354, 361 (1957) (assuming without deciding that the sentence is part of the trial for purposes of the Sixth Amendment). However, most circuits that have addressed this issue have held that the right to a speedy trial extends to this phase. See, e.g., United States v. Yelverton, 197 F.3d 531, 535-39 (D.C. Cir. 1999); Burkett v. Cunningham, 826 F.2d 1208, 1220 (3d Cir. 1987); United States v. Reese, 568 F.2d 1246, 1252-53 (6th Cir. 1977). Several other circuits, including this one, have assumed without deciding that the right extends to sentencing. See, e.g., Katz v. King, 627 F.2d 568, 576 (1st Cir. 1980); United States v. Rothrock, 20 F.3d 709, 711 (7th Cir. 1994). No circuit has held that the right to a speedy trial does not apply at this phase.[17]

We assume for the purposes of this appeal that the right to a speedy trial extends to sentencing. We analyze the defendant's claim under the four factors that the Supreme Court set out in Barker v. Wingo, 407 U.S. 514, 530 (1972): the length of the delay; the reason for the delay; the defendant's assertion of his right; and prejudice to the defendant. None of these factors is a necessary or sufficient condition to the finding of a deprivation

---

[17] A judge is also required under Fed. R. Crim. P. 32(a) to sentence a defendant "without unnecessary delay." Caribe has not argued that the delay in his case violated this rule, and therefore we do not address whether he would have a possible claim thereunder.

of the right to a speedy sentencing.  See id. at 533.

Applying these factors to the case at hand, we conclude that any right to speedy sentencing was not violated.  A fourteen-month delay between the date of conviction and the date of sentencing is long enough to trigger an inquiry into the other Barker factors. See Perez v. Sullivan, 793 F.2d 249, 254 (10th Cir. 1986) (finding a fifteen-month delay long enough to provoke an inquiry into the remaining three factors); see also Barker, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance"); Katz, 627 F.2d at 577 (finding that a four-month delay is "not unreasonable and certainly not of constitutional dimensions").

Caribe does not make a persuasive showing on any of the other factors.  It took approximately seven months for the probation officer to complete the presentence report and for the parties to submit their objections.  This time was not excessive given the length of the trial, the number of defendants, and the complexity of the evidence, and indeed Caribe has not challenged this portion of the delay.  Much of the later delay can be attributed to Caribe's own motions.  He filed a series of motions to continue his sentencing: the first such motions were filed on December 17, 1999 and February 1, 2000 and were denied on January 13, 2000 and February 4, 2000, respectively; the court acceded to later requests

from Caribe's counsel to postpone the sentencing, which had been scheduled for February 25, 2000; the court eventually denied Caribe's December 6, 2000 motion to continue his sentencing on December 13, 2000 and sentenced Caribe on December 15, 2000. Caribe also filed a motion for a new trial, which the court denied on December 15, 2000.

Finally, and most importantly, Caribe has not shown he suffered any prejudice as a result of the fourteen-month delay. The prejudice resulting from a delay between indictment and trial is obvious: the accused must live with the anxiety and concern of facing trial; he may have to spend an extended length of time in custody; and his defense may be impaired if witnesses' memories fade. However, "[m]ost of those interests diminish or disappear altogether once there has been a conviction." Perez, 793 F.2d at 256. Thus, the courts have great reluctance to find a speedy trial deprivation where there is no substantial and demonstrable prejudice. Id. Caribe argues that the delay made it more difficult for him to challenge the contested factual allegations in the presentence report, but he does not explain which allegations or how he was prejudiced. He also claims that the delay gave the government more time to persuade the probation officer to include unwarranted enhancements in the presentence report, but as discussed below, Caribe was not prejudiced by these communications. Caribe may have been anxious about the length of the sentence the

judge would impose, but such anxiety is present in every sentencing and cannot be sufficient to meet the prejudice requirement.

    2.  <u>Ex Parte Communications Between Prosecution and Probation Officer</u>

Caribe also argues that the prosecution violated Fed. R. Crim. P. 32(b)(6)(B) by having ex parte communications with the probation officer who wrote the presentence report. Caribe apparently wants this court to eliminate the two enhancements added to his offense level and remand the case to the district judge for re-sentencing. Rule 32(b)(6)(B) provides:

> Within 14 days after receiving the presentence report, the parties shall communicate in writing to the probation officer, and to each other, any objections to any material information, sentencing classifications, sentencing guideline ranges, and policy statements contained in or omitted from the presentence report. After receiving objections, the probation officer may meet with the defendant, the defendant's counsel, and the attorney for the Government to discuss those objections. The probation officer may also conduct a further investigation and revise the presentence report as appropriate.

The probation officer issued her initial presentence report to both parties on February 3, 2000. This report did not recommend an enhancement for Caribe's leadership role in the conspiracy or possession of a gun during the conspiracy. Caribe alleges that Agent Plichta then met with the probation officer and reviewed the evidence about Caribe's role in the conspiracy. The probation officer then amended her report to recommend a four-level enhancement for a leadership role and a two-level enhancement for firearm possession. Caribe's counsel was not given a chance to

rebut Agent Plichta's statements before the amended report was released, although he was able to file formal objections pursuant to Rule 32 and to raise his objections directly to the district court during the sentencing hearing. Caribe filed a motion objecting to the ex parte communications and demanding disclosure of all documents that the probation officer used in preparing the presentence report. The defendant also asked to be able to call the probation officer as a witness at the sentencing hearing to examine the extent of the communications.

In a published opinion, United States v. Caribe Garcia, 125 F. Supp. 2d 19 (D.P.R. 2000), the district judge denied the motion. The court held that there was no prosecutorial misconduct because "disclosing information to the probation officer [is] the functional equivalent of disclosing information to the court itself." Id. at 21. The court also stated that Caribe failed to show that he was entitled to a downward departure given that the presentence report only recommends a sentence and the final sentencing determination is made "after the Court hears arguments and objections to the presentence report in open court." Id. We agree with the second basis for the court's opinion but not the first.

The first issue is difficult because of the discrepancy between the fairly formal procedure contemplated by Rule 32 and the more informal reality. It is common for one side to speak with the

probation officer, either before or after the report is released. One district court has stated that, in that court's experience, ex parte communications between the government and the probation officer preparing the report are "appropriate and regular." Roccisano v. United States, 936 F. Supp. 96, 103 (S.D.N.Y. 1996). But we could not fully embrace such informality without reading Rule 32(b) out of the Federal Rules; Rule 32(b) does require a more structured process, at least in the fourteen-day period following the release of the presentence report.

Rule 32(b) is literally read as permitting ex parte communications initiated by either party both before and after this fourteen-day period. During the fourteen-day period, however, while the parties are preparing their written objections to the presentence report, the parties, under the rule, should communicate with the probation officer only in writing, and all communications must be disclosed to the other party. This reading of the rule permits most of the present informality, while allowing both sides to know the scope of the objections. See Fed. R. Crim. P. 32(b)(6)(B) advisory committee notes to 1994 Amendments (the parties should have a "fair opportunity . . . to review, object to, and comment upon, the probation officer's report in advance of the sentencing hearing"). There are benefits to informality, but the parties should at least know what issues are on the table concerning the presentence report so they can present counter-

arguments if they desire.

Even if contact with Agent Plichta did inadvertently violate Rule 32, Caribe has failed to show that he has suffered any harm as a result. First, he does not explain what he hoped to accomplish by additional discovery or by calling the probation officer to testify at the sentencing hearing. The revised presentence report apparently sets forth the additional evidence the probation officer relied upon in amending her recommendations, and all other facts appear to be undisputed. Second, as the district court noted, the report is only a recommendation to the court; the court is not bound to accept these recommendations. The district court in this case had notice that the second report was prepared after the prosecution's alleged ex parte contact and gave Caribe's counsel ample opportunity at sentencing to dispute the report's recommendations. The court then found that the enhancements were appropriate and sentenced the defendant accordingly. Thus Caribe fails to show what harm he suffered as a result of the ex parte communications. See, e.g., Montoya, 62 F.3d at 3 (1st Cir. 1995) ("[T]he sentencing court has ample power to deal with [prosecutorial misconduct impacting the judge's sentencing options] by excluding the tainted transaction from the computation of relevant conduct or by departing from the [recommendation].").

M.  Conclusion

    We **affirm** the judgments and the sentences and reject each of the defendant's claims, except that we **remand**, in accordance with this opinion, the issue of the term of supervised release for Rodriguez and **vacate** that aspect only of his sentence.  So ordered.