USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-1666 UNITED STATES OF AMERICA, Appellee, v. JOHN BERIO MONTOYA, a/k/a JOHN FREDDY MONTOYA, Defendant, Appellant. ____________________ No. 94-1667 UNITED STATES OF AMERICA, Appellee, v. MARCO VILLEGAS, Defendant, Appellant. ____________________ No. 94-1668 UNITED STATES OF AMERICA, Appellee, v. GUILLERMO MONTOYA, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ ____________________ Eileen Donoghue, by Appointment of the Court, for appellant Marco _______________ Villegas. Raymond E. Gillespie, by Appointment of the Court, for appellant _____________________ John Berio Montoya. Diana L. Maldonado, Federal Defender's Office, for appellant ____________________ Guillermo Montoya. Jeffrey A. Locke, Assistant United States Attorney, with whom _________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ July 27, 1995 ____________________ BOUDIN, Circuit Judge. The three appellants in this _____________ case--Marco Villegas, Guillermo Montoya and John Berio Montoya--were indicted for conspiracy to possess cocaine with intent to distribute and for possession with intent to distribute. 21 U.S.C. 841, 846. After guilty pleas, they were sentenced to mandatory minimum terms of 10 years' imprisonment, as well as supervised release and the ordinary special assessment. They appeal their sentences on the ground that the government manipulated upward the amount of cocaine for which they were held responsible. The underlying facts are largely undisputed. In August 1992, the FBI began a reverse sting operation in Boston, its undercover agent (Antonio Dillon) purporting to act as a high-volume wholesaler of cocaine seeking new distributors in the area. On August 26, 1992, Dillon met with Villegas who on behalf of Guillermo Montoya and his brother Hernan was seeking a new source of supply of cocaine. Like many of the subsequent encounters, this meeting was taped by the FBI.  Villegas said that the Montoyas were, by their own account, selling 15 to 25 kilograms of cocaine a week and paying between $19,500 and $20,000 per kilogram. He also said that he had been in the cocaine business with the Montoyas for six years. Villegas made similar statements at a September 7 meeting, although he there said that a New Jersey supplier was providing the brothers cocaine at -3- -3- $16,000-18,000 per kilogram. Villegas also offered to rent his garage to store the cocaine. On September 18, 1992, Dillon met with Villegas, Guillermo Montoya and John Berio Montoya at a Boston restaurant. Dillon said that he would require a minimum purchase of 10 kilograms, with a down payment equal to three kilograms and payment of the balance in 15 to 20 days after delivery. Dillon requested $19,500 per kilogram; Guillermo Montoya balked; and Dillon ultimately offered a price of $17,000 per kilogram. Guillermo Montoya said he would consider buying 10 kilograms with a down payment of $50,000. There were subsequent meetings in December 1992 and the first three months of 1993. Pleading a shortage of cash, Guillermo Montoya got the down payment reduced to a $5,000 advance for expenses (paid by John Berio Montoya in February 1993) and a $20,000 initial payment on delivery of the 10 kilograms. In a March meeting, Villegas and Guillermo Montoya discussed the possibility after the first purchase of increasing the sales from 10-15 kilograms per week to 20 kilograms. On March 30, 1993, the 10 kilograms were delivered and the appellants were then arrested. At sentencing, each appellant objected to the determination in the pre-sentence report that the base offense level should be premised on a 10-kilogram transaction. The appellants did not dispute that 10 -4- -4- kilograms had been ordered and delivered, nor claim that the $17,000 price was below the market price. But they said that the government had manipulated the quantity upward by reducing the down payment from $50,000 to $25,000. Based on Dillon's original proposal of a one-third down payment, appellants urged that each appellant should be held liable only for three or four kilograms. At the close of the sentencing hearing, the district court found that there was no manipulation of sentencing factors. The district judge said that the appellants were predisposed to purchase 10 kilograms and that they could and did purchase this amount. Since any amount of five kilograms or more triggers a mandatory minimum of 10 years' imprisonment, 21 U.S.C. 841(b)(1)(A), the district court imposed this sentence. The present appeals followed. At the threshold, the government tells us that we lack jurisdiction over the appeals, saying that appellants cast their claim in the district court as one for a downward departure. Refusals to depart are not reviewable unless the district court has mistaken its own legal authority or made some other mistake of law. United States v. DeCosta, 37 F.3d _____________ _______ 5, 8 (1st Cir. 1994). Appellants say that their request was not limited to a departure from the guideline range, pointing out that they asked the court to sentence below the statutory _________ minimum. -5- -5- This is one of these superficially confusing situations in which "jurisdiction" is in certain respects intertwined with "the merits"; and "the merits" in turn depend on a still evolving body of case law. Under umbrella terms like sentencing entrapment and sentencing factor manipulation, the circuit courts have provided a certain amount of guidance, but there are some divisions among the circuits, and--even in the mainstream--more criteria than rules. This is to be expected, for the problem arises in context that is comparatively recent. Undercover agents of the state have been "plotting" with potential defendants since Elizabethan times, and probably long before. But in federal courts the broad latitude formerly allowed to a sentencing judge made it easy to account for any equity. This discretion has now been curtailed by sentencing guidelines and statutory minimums, often keyed to amounts of drugs involved and dollars stolen. In turn, attention has turned to escape-hatch arguments which might exclude from the equation a portion of the criminal conduct. Our own cases have concluded that where government agents have improperly enlarged the scope or scale of the __________ crime, the sentencing court "has ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the -6- -6- [guideline sentencing range]." United States v. Connell, 960 _____________ _______ F.2d 191, 195 (1st Cir. 1992). See also United States v. ___ ____ _____________ Gibbens, 25 F.3d 28, 30-32 (1st Cir. 1994); United States v. _______ _____________ Brewster, 1 F.3d 51, 55 (1st Cir. 1993). We think that this ________ broad principle applies to statutory minimums as well as to the guidelines. Admittedly, there is no statute to this effect. But there is also no statute enacting the familiar defense of entrapment or other defenses like duress or necessity. 1 W. LaFave & A. Scott, Substantive Criminal Law, 5.2-5.4 __________________________ (1986). In creating such supplementary doctrines, courts have usually been careful not to insist on much more than minimum decency seems to require. As this court said in Connell, "[c]ourts should go very slowly before staking out _______ rules that will deter government agents from the proper performance of their investigative duties." 960 F.2d at 196. It is no accident that statements condemning sentencing factor manipulation are usually dicta. A defendant cannot make out a case of undue provocation simply by showing that the idea originated with the government or that the conduct was encouraged by it, e.g., Brewster, 1 F.3d at 55, or that ____ ________ the crime was prolonged beyond the first criminal act, e.g., ____ Gibbens, 25 F.3d at 31, or exceeded in degree or kind what _______ the defendant had done before. E.g., Connell, 960 F.2d at ____ _______ -7- -7- 195-96. What the defendant needs in order to require a reduction are elements like these carried to such a degree _________________ that the government's conduct must be viewed as "extraordinary misconduct." Gibbens, 25 F.3d at 31. _______ The standard is high because we are talking about a reduction at sentencing, in the teeth of a statute or guideline approved by Congress, for a defendant who did not raise or did not prevail upon an entrapment defense at trial. The standard is general because it is designed for a vast range of circumstances and of incommensurable variables. See ___ Gibbens, 25 F.3d at 31. The most important of these, as we _______ have stressed, is likely to be the conduct of the government, including the reasons why its agents enlarged or prolonged the criminal conduct in question. See id. at 31 & n.3. ___ ___ In other situations, the defendant's own predisposition may enter into the calculus, see Connell, 960 F.2d at 196, ___ _______ speaking of conduct "overbear[ing] the will of a person predisposed only to committing a lesser crime." But the analogy at sentencing to ordinary entrapment is not often going to help a defendant who is arguing only about the number or size of the transactions. Having crossed the reasonably bright line between guilt and innocence, such a defendant's criminal inclination has already been established, and the extent of the crime is more likely to be a matter of opportunity than of scruple. -8- -8- Because of the diversity of circumstances, we have declined to create detailed rules as to what is or is not undue manipulation, Gibbens, 25 F.3d at 31, but we think it _______ is useful now to be very candid in saying that garden variety manipulation claims are largely a waste of time. Nevertheless, where a defendant wants to argue that there has occurred a sentencing manipulation amounting to "extraordinary misconduct," we think that the claim need not be limited to a request for a discretionary departure, that it applies to statutory mandatory minimums as well as to guideline ranges, and that it is subject to appellate review. Of course, the burden of proof is upon the defendant to show that he is entitled to a reduction. Gibbens, 25 F.3d at _______ 31-32. The district court's fact findings on this issue, as on other fact questions, are subject to the clearly erroneous standard. Id. at 30. Because manipulation is largely a ___ fact-bound inquiry, even the district court's ultimate judgment whether the government's conduct is outrageous or intolerable is not lightly to be disregarded. Id. at 32; cf. ___ ___ United States v. Rosen, 929 F.2d 839, 844 (1st Cir.), cert. _____________ _____ _____ denied, 502 U.S. 819 (1991). ______ Against this backdrop, we decline to dismiss this appeal for lack of jurisdiction, but affirm on the merits with little hesitation. This case involves a single transaction, not a string of crimes prolonged by the government; the price -9- -9- was within the market range; and the appellants by their own recorded admissions were well established drug dealers or abetters who had previously dealt in very substantial quantities. As in most stings, this episode began with the government; but as to pressure, there was none, let alone outrageous or intolerable pressure. Nor was there an indication of any illegitimate motive on the part of the agents. All that agent Dillon did was to reduce the down payment in the face of claims by appellants that they were short of cash to make the full down payment originally proposed. This is so far from government misconduct that we would not have written a published opinion but for two considerations. One is the government's jurisdictional objection and the need to make clear the procedural framework in which we will consider such claims. And the other is to make very explicit the plain import of our previous cases: sentencing factor manipulation is a claim only for the extreme and unusual case. One qualification remains to be mentioned. What we have said is directed to claims that the district court must disregard at sentencing a portion of the criminal conduct because it was the product of impermissible government manipulation. Quite possibly--we need not definitively decide the point--a district court may order a discretionary -10- -10- downward departure from the guideline range on something less than extraordinary misconduct. Indeed, this is made fairly clear for one narrow class of conduct, by U.S.S.G. 2D1.1, comment. (n.17), which provides: If, in a reverse sting . . . the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted. It is doubtful that expressio unius concepts would _______________ prevent a defendant from seeking such a discretionary downward departure in other analogous circumstances--although _____ not literally within this application note--assuming that the general precepts for downward departures were met. U.S.S.G. 5K2.0 (not-contemplated-by-commission test); see also ___ ____ United States v. Rivera, 994 F.2d 942 (1st Cir. 1993). But, _____________ ______ by the same token, a refusal to depart is normally unreviewable. We mention departures to make clear that the stringent standards discussed above do not supplant the guidelines' own rules for discretionary departures. That the same core of facts might give rise to two related but ultimately different claims at sentencing is a complexity, although one not often likely to affect the outcome. But in addition to the different procedural -11- -11- framework, there is a difference in emphasis. Sentencing manipulation, as we have stressed, is primarily concerned with impermissible conduct by the government. By contrast, the guidelines, and by extension departures from the guidelines, are centrally concerned with a proper sentence for the defendant in light of his own conduct and his own criminal history. Affirmed. _________ -12- -12-