UNITED STATES

v.

**Richard A. DION.**

Nos. 99–32–T, 99–33–06–T.

United States District Court, D. Rhode Island.

March 7, 2000.

---

James H. Leavey, Asst. United States Attorney, United States Attorney's Office, Providence, RI, for plaintiffs.

William J. Murphy, Providence, RI, for defendants.

## MEMORANDUM OF DECISION

TORRES, Chief Judge.

Richard A. Dion pled guilty to five counts of an indictment charging him with distributing cocaine, (Cr. No. 99–32), and to three counts of a separate indictment charging him with racketeering and extortion. (Cr.99–33–06.)

Because the quantity of cocaine distributed was more than 500 grams, the Federal Sentencing Guidelines call for a sentence of 63–78 months, see U.S. Sentencing Guidelines Manual ("USSG") §§ 2D1.1 & 5A (1998), and 21 U.S.C. § 841(b)(1)(B) mandates a sentence of at least five years in prison.

At the time of sentencing, Dion moved for a downward departure. He claimed that federal agents engaged in sentence factor manipulation by continuing to purchase cocaine from him until he sold more than 500 grams in order to increase the potential penalty, thereby exerting more pressure on Dion to provide evidence against his co-defendants in the extortion case.

In a bench decision made on January 28, 2000, this Court denied Dion's motion for a downward departure and sentenced him to 63 months in prison. Because the issue raised is an important one on which there is relatively little law, this Memorandum of that decision is being issued.

### Facts

The racketeering indictment charges that Dion was part of a wide-ranging conspiracy to collect gambling debts by extortionate means. Specifically, it alleges that Dion acted as an enforcer and threatened at least two people with physical harm if they failed to make payment. One of the victims was Robert Atamian, who Dion learned was addicted to the prescription drug Vicodin. When Atamian became fearful for his safety, he sought protection from the FBI. Agents persuaded him to begin purchasing Vicodin and, later, cocaine from Dion who was under investigation for his role in the racketeering activity.

Over a period of several months, Atamian made five cocaine purchases from Dion. During that time, agents placed Dion under "loose" surveillance in an effort to identify his supplier. That effort was unsuccessful; and, after the fifth purchase, agents stopped providing Atamian with the money to make any further purchases.

### Discussion

*I. Sentencing Factor Manipulation—The Legal Principle.*

The First Circuit has recognized that the imposition of a sentence that is less than what, otherwise, would be required by the Sentencing Guidelines or by a statutorily-prescribed minimum sentence may be permissible in cases where the government has engaged in sentencing factor manipulation. *See United States v. Montoya,* 62 F.3d 1, 3 (1st Cir.1995).

Sentencing factor manipulation occurs when government agents have "improperly" enlarged the scope or scale of the defendant's crime. *Montoya,* 62 F.3d at 3. A defendant who seeks a downward departure bears the burden of establishing that the government has acted "improperly" and for the purpose of artificially enhancing the penalty. *United States v. Gibbens,* 25 F.3d 28, 31 (1st Cir.1994). The defendant must do more than simply show that, as a result of the government's participation, "the crime was prolonged beyond the first criminal act, or exceeded in degree or kind what the defendant had

done before." *Montoya*, 62 F.3d at 4 (internal quotations omitted). Rather, the defendant must demonstrate that the government's activities were "carried to such a degree that the government's conduct must be viewed as 'extraordinary misconduct.'" *Id.* As the First Circuit has said:

> The standard is high because we are talking about a reduction at sentencing, in the teeth of a statute or guideline approved by Congress, for a defendant who did not raise or did not prevail upon an entrapment defense at trial. The standard is general because it is designed for a vast range of circumstances and of incommensurable variables. The most important of these, as we have stressed, is likely to be the conduct of the government, including the reasons why its agents enlarged or prolonged the criminal conduct in question.

*Id.*

In applying this standard, there is a very significant difference between a case in which the government simply affords a defendant an opportunity to commit a crime that he is predisposed to commit and a case in which the government alters the nature or the magnitude of the crime for the sole purpose of increasing the penalty. The first clearly is a permissible crime fighting technique that courts repeatedly have upheld. *See, e.g., United States v. Connell*, 960 F.2d 191, 196 (1st Cir.1992) (stating, "[b]y their nature, sting operations are designed to tempt the criminally inclined"). The second is not.

In some cases, the line between the two is a very fine one. The determination of whether the line has been crossed is a matter of degree, and it usually turns on the facts of the case.

Generally, the cases that raise concerns regarding sentencing factor manipulation are those in which the sentence is subject to being increased by the unilateral action of government agents and those in which government agents require changes in the agreed upon course of action that alter the nature or magnitude of the offense. This Court has dealt with cases raising each of these concerns.

In one case, agents conducted a sting operation by setting up what was portrayed as a drug stash house where quantities of cocaine and cash supposedly were kept. The defendants were apprehended when they attempted to rob the stash house and were charged with a variety of drug and firearms offenses. Since the quantity of cocaine that the defendants attempted to possess was an important factor in calculating the applicable guideline range, the fact that agents had the ability to unilaterally control the amount of cocaine in the stash house was a source of great concern to this Court. After careful consideration, this Court was satisfied that agents did not artificially inflate the quantity in order to unfairly manipulate the defendant's sentence.

In another case, the defendant had agreed to purchase a firearm from undercover agents for an agreed upon amount of cash. However, at the time of the agreed upon exchange, the agents, knowing that the defendant also dealt drugs, demanded cocaine as part of the purchase price. In order to consummate the deal, the defendant reluctantly agreed, thereby subjecting himself to a thirty-year mandatory minimum sentence for using a firearm during and in relation to a drug trafficking offense. In that case, this Court found the line had been crossed and dismissed that count of the indictment. *See United States v. Carreiro*, 14 F.Supp.2d 196, 198 (D.R.I.1998).

## II. *Application of the Principles*

This case does not implicate the concerns raised in either of the aforementioned cases. Dion claims that agents improperly manipulated his sentence by causing Atamian to continue purchasing cocaine from him until the quantity exceeded five hundred grams, and that it did so for the purpose of pressuring him to cooperate in the extortion case. In this

case, the line between proper and improper government conduct is much more definable and it is clear that the line has not been crossed.

Implicit in Dion's argument is the premise that the government is required to terminate a criminal investigation or an undercover operation once it has sufficient evidence to convict a defendant. However, the government has no such obligation. *See Montoya*, 62 F.3d at 3–4. Indeed, such an obligation would in many cases prevent the government from establishing the true magnitude of the defendant's criminal activity or from identifying all of the participants. *See Saccoccia v. United States*, 69 F.Supp.2d 297, 306 (D.R.I.1999). Furthermore, it would run counter to the Guidelines' purpose of correlating the penalty for drug trafficking with the quantity of drugs that a defendant sells which serves as a surrogate measure of the harm inflicted on society. A defendant who has access to and sells large quantities of drugs would be insulated from the full consequences of his conduct simply because he is clever enough to conceal his supply and makes the sales in installments over a period of time rather than in a few larger transactions.

Nor is this a case in which the government had the power to unilaterally increase Dion's sentence. Dion's participation was required in order for a sale to take place and he had the ability to choose whether or not he was going to make the sale and how much he was willing to sell.

Finally, this case does not present the risk that agents may have improperly altered the nature or magnitude of the crime that Dion was inclined to commit by pressuring him to accept materially different terms dictated by the government at the eleventh hour. On the contrary, the record shows that Dion freely and voluntarily chose to continue selling cocaine to Atamian. In fact, the intercepts of statements made by Dion, himself, indicate that he had been selling cocaine to others and that he was planning to start obtaining cocaine in kilogram quantities in order to increase his profits.

Dion relies on a statement that agents made to Atamian after the fifth buy telling him that they did not need him to make any more purchases because they "had enough." That comment lends support to Dion's contention that in funding Atamian's contraband buys, agents were motivated, at least in part, by a desire that Dion's potential sentence be high enough to induce him to cooperate in the extortion case.

Nonetheless, such a motive, by itself, would not warrant classifying the continued purchases as a form of sentencing factor manipulation. It is well-established that obtaining the cooperation of a defendant in order to prosecute others for suspected crimes is an appropriate law enforcement technique, as long as improper methods are not employed. *Cf. United States v. Magana*, 127 F.3d 1, 9 (1st Cir. 1997). The mere desire to wait until a defendant has become deeply enough involved in criminal activity that he has a real incentive to cooperate does not convert what otherwise would be permissible governmental conduct into impermissible conduct. For example, an arrest made with probable cause is not rendered invalid simply because the officer making the arrest harbored a subjective desire that the arrestee be prosecuted.

In short, ordinarily, the focus is on the propriety of the government's conduct. There may be cases in which the subjective motives of agents is a consideration because a defendant is unfairly targeted for different treatment due to his race or some other invidiously discriminatory reason. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Gary*, 74 F.3d 304, 313 (1st Cir.1996). However, this is not one of those cases.

Also, in this case, the desire to induce Dion's cooperation was only one of the agents' motives. They also had other le-

gitimate reasons for making multiple purchases from Dion and for calling a halt to the purchases when they did. As already noted, agents had ample grounds to believe that Dion was a drug dealer. Consequently, they were justified in continuing to make purchases from him for the purpose of gathering evidence regarding the scope of his drug trafficking activity and attempting to learn the identity of his supplier. The agents' surveillance of Dion confirms that at least part of their motive was to discover who Dion's supplier was.

Dion argues that if the government really wanted to learn the identity of his supplier, it could have conducted tighter surveillance and that it would not have stopped buying from him before learning who the supplier was. However, the government is not required to conduct a state of the art investigation or to exhaust all other possible means of obtaining that information. That is especially true in a case, like this, where tighter surveillance presented a risk that Atamian, a key witness in the extortion case, would be exposed as a government informant.

Moreover, agents had two good reasons for terminating the buys from Dion after the fifth purchase. First, the FBI was becoming concerned about the cost of continued purchases, particularly since little progress was being made in learning the identity of Dion's supplier. In addition, the FBI had a need to "make Mr. Atamian disappear" because he was a critical witness in the extortion investigation.

### Conclusion

To summarize, the denial of Dion's motion for a downward departure is based on the absence of any indication that the government engaged in any outrageous or improper conduct that fairly could be described as sentencing factor manipulation.