# United States Court of Appeals
## For the First Circuit

No. 10-1651

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ NETO, a/k/a "ZEZAO,"

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

David Shaughnessy, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief for appellee.

October 25, 2011

**TORRUELLA**, **Circuit Judge**. In 2006, Appellant José Neto ("Neto") was convicted of various immigration-related crimes, including harboring five illegal aliens from Brazil. After his trial, but before his sentencing, Neto was indicted in a new criminal case for smuggling those same five aliens into the United States. Neto was sentenced to five years' imprisonment for the first set of crimes in 2007. Neto's first sentence expired in 2009, while he was awaiting trial on his second indictment. Neto moved to dismiss the second indictment on the ground that it constituted a successive prosecution in violation of his Due Process rights under the Fifth Amendment. The district court denied the motion to dismiss, and Neto was later found guilty and sentenced to another five years' imprisonment. Neto now appeals the second conviction and sentence. Because we find no constitutional violation in Neto's second conviction or sentence, we affirm.

## I. Background

### A. Smuggling Operation[1]

Neto's smuggling operation began sometime in 2003 and continued until roughly March 2005. Neto and his co-conspirator, José Neves ("Neves"), recruited men from rural Brazil and, for a $10,000 fee, agreed to smuggle them into the United States and find

---

[1]  We draw these facts from the uncontested portions of the presentence report (PSR). See United States v. Brewster, 127 F.3d 22, 24 (1st Cir. 1997).

jobs for them. Between twenty-five and thirty aliens came to the United States via this scheme. Neto employed many of the aliens at Spectral Cleaning Service ("Spectral"), a company he purchased in 2004. Spectral had a contract to clean the floors of various grocery stores in Massachusetts and Connecticut. Neto collected any outstanding smuggling fees by deducting the money from the aliens' paychecks; Neto also charged the aliens 5% interest per month.

In September of 2004, Neto was called into the offices of the Bureau of Immigration and Customs Enforcement ("ICE") for an interview. During the interview, ICE officials determined that Neto, himself a Brazilian national, was in the United States illegally and informed Neto that he would be deported. Neto offered an ICE official a $10,000 bribe for a green card for himself and another $10,000 for a green card for his wife, also an illegal alien. The official notified ICE of the bribery attempt, and ICE set up an undercover operation in which Neto was led to believe that he could pay cash for immigration-related favors for himself and others. Over the course of the next six months, Neto paid undercover ICE agents $167,100 in bribes. During this period, ICE agents also uncovered evidence of Neto's and Neves's smuggling and harboring of illegal aliens.

## B. Arrest and Trial in Neto I

Neto was arrested on March 16, 2005. That same day, ICE agents raided grocery stores in western Massachusetts and detained many Spectral employees. On April 12, 2005, a federal grand jury returned a 36-count indictment in the first criminal case against Neto, referred to hereafter as "Neto I." Only nine of the thirty-six counts alleged bribery; the remaining counts were: (1) twenty-three counts of inducing aliens to reside in the United States illegally, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv); (2) three counts of harboring illegal aliens, in violation of 8 U.S.C. § 1324 (a)(1)(A)(iii); and (3) one count of hiring illegal aliens, in violation of 8 U.S.C. § 1324A. On January 10, 2006, the United States obtained a superseding indictment that added five new counts of harboring illegal aliens and one new count of employing illegal aliens.[2] Neto pled guilty to most counts of the indictment, but elected to go to trial on all eight harboring counts. The trial on the harboring counts began on May 8, 2006. Although the indictment in Neto I did not charge smuggling, the trial included testimony about the smuggling operation in furtherance of proving the harboring charge. On May 10, 2006, the jury found Neto guilty on six of the eight harboring counts.

---

[2]  The superseding indictment also added a count alleging extortionate extension of credit, but this count was later dropped.

On January 23, 2007, the court sentenced Neto to 60 months in prison for the harboring and bribery counts. This sentence represented a downward departure from the recommended range of 78 to 97 months under the United States Sentencing Guidelines. The United States had opposed a downward departure because of the exploitative nature of Neto's scheme: Neto forced his employees at Spectral to work 363 days per year, and admitted that he extorted high interest payments from those he harbored by threatening to kill their relatives in Brazil.

## C.  Procedural History of Neto II

On October 25, 2006, after the conclusion of the Neto I trial but before sentencing, the government obtained an indictment in a second criminal case, referred to hereafter as "Neto II," which underlies the present appeal. Unlike the indictment in Neto I, the indictment in Neto II included Neves as a co-defendant. The indictment charged Neto and Neves with one count of conspiracy to smuggle aliens for profit and to induce aliens to reside in the United States illegally and five counts of smuggling aliens for profit, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii).[3] The aliens who were the subjects of the five smuggling counts were five Brazilian men who had been the subjects of harboring counts for which Neto was convicted in Neto I.

---

[3]  The indictment also charged Neves alone with five counts of inducing aliens to reside in the United States illegally.

-5-

The Neto II indictment was initially sealed because Neves was a fugitive. Thus, the government did not disclose the indictment to the Neto I trial judge prior to Neto's sentencing. However, on July 30, 2007, ICE agents located Neves in Florida and arrested him. The indictment in Neto II was unsealed the same day. Neto was arraigned on September 12, 2007. Neto's sentence in Neto I expired on July 22, 2009, while Neto was awaiting trial in Neto II. On October 29, 2009, Neto filed a motion to dismiss the indictment in Neto II, arguing that prosecution in Neto II would be fundamentally unfair and would thus violate his Due Process rights under the Fifth Amendment.

Neto raised two primary arguments in his motion to dismiss. First, Neto contended that because the United States would seek to convict him for smuggling in Neto II using essentially the same facts at issue in the harboring claims against him in Neto I, the government should have tried the smuggling and harboring cases together in Neto I. Second, Neto argued that a second prosecution would be unfair because of the "draconian sentencing outcome" that would result. Neto contended that under the sentencing guidelines, if he had been prosecuted for the smuggling and harboring charges in the same proceeding, he would have received a concurrent five-year sentence for both charges. However, because he was now being prosecuted for smuggling after his original sentence had expired, and because the smuggling charge

carried a five-year statutory minimum sentence, he would be subjected to an additional five years in prison.

In response, the government argued that the validity of the Neto II prosecution had to be analyzed under the Double Jeopardy Clause of the Fifth Amendment, rather than under the Due Process Clause. Therefore, the government argued that the applicable test was the one articulated in Blockburger v. United States, in which the Supreme Court held that a person can be prosecuted under multiple statutes for the same conduct as long as each statute "requires proof of a fact which the other does not." 248 U.S. 299, 304 (1932). As Neto himself had conceded in a footnote in his motion to dismiss Neto II, the Neto II prosecution satisfied the Blockburger test: the harboring charges in Neto I required proof that Neto knowingly harbored aliens who were in the country illegally, while the smuggling charges in Neto II required proof that Neto brought illegal aliens into the United States. Additionally, the government noted that it had offered Neto the opportunity to avoid the statutory minimum sentence on the substantive smuggling counts by pleading guilty to conspiracy, but that Neto chose not to accept this offer.

At a hearing on December 17, 2009, the district court denied Neto's motion to dismiss. The court applied the logic of United States v. Stokes, in which this Court held that an otherwise valid indictment should not be dismissed simply because a sentence

might raise constitutional problems <u>if</u> the defendant were convicted.  124 F.3d 39, 44 (1997).  The district court found that the <u>Neto II</u> indictment did not in itself violate Neto's Due Process rights because there was no evidence that the government had an improper motive for charging the smuggling counts separately.  Therefore, the court ordered the case to proceed to trial.  However, the court expressly preserved Neto's right to argue at sentencing that the court should either depart downward from a guideline sentence or not impose a statutory mandatory minimum sentence.

At the trial in <u>Neto II</u>, the government offered testimony about the smuggling operation from each of the five Brazilian men who were the subjects of the smuggling counts.  On February 9, 2010, a jury found Neto guilty of the one charged count of conspiracy to smuggle aliens for profit and three of the five charged counts of smuggling aliens for profit.  Under 8 U.S.C. § 1324(a)(2)(B), the combination of the three smuggling convictions resulted in a mandatory five-year minimum sentence.

In his sentencing memorandum, Neto argued that fundamental fairness required a sentence below the five-year minimum.  Neto contended that the court had the authority to impose a sentence below the statutory minimum pursuant to <u>United States</u> v. <u>Montoya</u>, in which this Court held that sentences below the statutory minimum might be permitted in cases where "government

agents have <u>improperly</u> enlarged the scope or scale of the crime." 62 F.3d 1, 3 (1st Cir. 1995) (emphasis in original). Neto contended that <u>Montoya</u> applied because the government had no legitimate motive for not prosecuting the smuggling and harboring counts together in <u>Neto I</u>. Neto further argued that a sentence below the minimum would be appropriate because sentencing in <u>Neto II</u> was delayed until after the sentence in <u>Neto I</u> had expired, thus eliminating the possibility of a concurrent sentence.

The government countered that only "extraordinary misconduct" could justify a sentence below the minimum under <u>Montoya</u>, and that there was no misconduct behind the successive prosecution on the smuggling charges. <u>See</u> 62 F.3d at 4. Additionally, the government again noted that it had offered Neto the opportunity to avoid the statutory minimum sentence on the substantive smuggling counts by pleading guilty to conspiracy, but that Neto chose not to accept this offer.[4]

The trial judge conducted a sentencing hearing on May 11, 2010, and decided to hear testimony regarding the government's motives for its prosecution strategy. Assistant United States Attorney ("AUSA") Paul G. Levenson, who prosecuted <u>Neto I</u>, testified that there were a number of reasons why the government did not prosecute Neto for smuggling in that case. First, the <u>Neto</u>

---

[4] Neves pled guilty to the conspiracy count, and to other counts of the indictment that applied only to him, on August 13, 2009.

I case was directed in part at the bribery attempts, in which only Neto was implicated; in contrast, the smuggling operation was a joint operation between Neto and Neves. Secondly, because Neves was a fugitive until 2007, AUSA Levenson was concerned about an "empty chair" defense if the government prosecuted Neto for smuggling -- i.e., that Neto would try to blame the then-absent Neves for the entire operation. AUSA Levenson also testified that he did not inform the Neto I trial judge about the Neto II indictment before sentencing in Neto I because it might have had an improper prejudicial effect on Neto and because unsealing the indictment might have harmed the government's effort to apprehend Neves.

In addition to hearing AUSA Levenson's testimony, the judge accepted a proffer from AUSA Brian T. Kelly regarding information that had been provided by former AUSA Sabita Singh ("Singh"), who had also been involved in Neto I and who obtained the indictment in Neto II. AUSA Singh had communicated two additional reasons for bringing a second indictment against Neto. First, the government believed the case against Neves would be stronger if Neto were charged in the same indictment. Second, the government was concerned that Neto might receive too light a sentence for his actions if the smuggling charges were added to Neto I. At the conclusion of the hearing, the judge requested

-10-

briefing from the parties to address the implications of the evidence presented by AUSAs Levenson and Kelly.

On May 19, 2010, the district court ruled that it did not have the authority to sentence Neto below the mandatory five-year minimum. The court found that the government's charging decision in Neto II was proper for at least four reasons: (1) the government's concern about the "empty chair" problem was valid; (2) the government likely could not have added Neves as a defendant in Neto I because he had no involvement in the bribery scheme; (3) Neves was a fugitive while Neto I was pending; and (4) it was reasonable for the government not to communicate ex parte with the Neto I trial judge about the Neto II indictment. In addition, the court held that the government's desire to secure what it felt was a suitable punishment for Neto was not an improper motive. The court also noted that while there was a long delay between the Neto II indictment and trial -- a delay that Neto contends possibly lead to a draconian sentencing result -- the government did not intentionally cause the delay. The indictment was sealed for some time because Neves was a fugitive, and the trial was delayed after the unsealing because of various pre-trial motions, including a "complex and challenging" motion to suppress by Neves.

The court sentenced Neto to five years' imprisonment followed by three years of supervised release. Neto now appeals both his conviction and his sentence.

## II.  Discussion

Neto presents three arguments on appeal.  First, he argues that the Neto II indictment itself is unconstitutional and should be dismissed.  Second, he argues that even if this Court upholds the indictment, we should remand the case for re-sentencing without regard to the five-year statutory minimum sentence.  Third, Neto argues that his trial counsel in Neto II was ineffective because he failed to ensure that the trial in Neto II concluded before the sentence from Neto I expired.  We address these arguments in turn.

### A.  Validity of Neto II Indictment

The parties do not dispute that Neto properly preserved his claim that the Neto II indictment should have been dismissed. We review properly-preserved legal and constitutional claims de novo.  United States v. S. Union Co., 630 F.3d 17, 24 (1st Cir. 2010).

Under the Double Jeopardy Clause of the Fifth Amendment, no person can "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  The Double Jeopardy protection "applies both to successive punishments and to successive prosecutions for the same criminal offense."  United States v. Dixon, 509 U.S. 688, 696 (1993).  The Blockburger test applies in both the successive punishment and successive

prosecution contexts.  United States v. Colón-Osorio, 10 F.3d 41, 44-45 (1st Cir. 1993) (explaining Dixon, 509 U.S. at 703-04).

As Neto concedes, this case satisfies the Blockburger test; therefore, Neto's prosecution and conviction in Neto II do not violate the Double Jeopardy Clause.  Neto contends, however, that the Due Process Clause[5] of the Fifth Amendment "supplements" the Double Jeopardy Clause's protections against successive prosecutions, and that his second prosecution violated his Due Process rights.

In support of his argument, Neto points to early cases in which the Supreme Court indicated that a Due Process analysis might apply to successive prosecutions in certain cases.  See, e.g., Ciucci v. Illinois, 356 U.S. 571, 573 (1958) (per curiam) (finding no Due Process violation "upon the record as it stands," but noting that two of the justices in the majority might have found "fundamental unfairness" if certain evidence suggesting improper prosecutorial motive were included in the record); Hoag v. New Jersey, 356 U.S. 464, 467-69 (1958) (stating that there might be "hypothetical situations in which the [Due Process Clause of] the Fourteenth Amendment might prohibit consecutive prosecutions of multiple offenses," but ultimately finding no Due Process violations on the facts).  See also Tucker v. Makowski, 883 F.2d

---

[5]  "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

-13-

877, 881 (10th Cir. 1989) (finding that separate robbery and kidnaping convictions arising out of the same incident satisfied Blockburger test, but remanding "for a consideration of the state court records in light of the due process standards for successive prosecutions contained in Hoag and Ciucci").[6]

Here, AUSA Singh admitted that one of the government's reasons for trying the smuggling charges separately was its concern that Neto might receive too light a sentence in Neto I. Neto contends that this motive was improper. Therefore, he argues, his prosecution in Neto II represented the kind of fundamental unfairness that can constitute a Due Process violation under Hoag and Ciucci.

However, Neto's reliance on Hoag and Ciucci is foreclosed by more recent Supreme Court precedent. In Sattazahn v. Pennsylvania, the Supreme Court rejected the argument that "the Due Process Clause provides greater double-jeopardy protection than

---

[6] Neto also extensively cites to law review articles advocating broader protections from successive prosecutions. See Anne Poulin, Double Jeopardy Protection From Successive Prosecution, 92 Geo. L.J. 1183, 1189-90, 1200-01 (2004) (arguing that Double Jeopardy protections must be expanded in the face of the proliferation of new statutory criminal provisions and in the face of modern rules allowing joinder of criminal charges); Akhil Reed Amar & Jonathan L. Marcus, Double Jeopardy After Rodney King, 95 Colum. L. Rev. 1, 34-36 (1995) (arguing that Due Process analysis should apply to successive prosecutions to ensure that prosecutors do not have improper motives for separating trials).

does the Double Jeopardy Clause."  537 U.S. 101, 116 (2003).[7]  As the Court explained:

> The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order.

Id. (quoting Medina v. California, 505 U.S. 437, 443 (1992)).  Additionally, the First Circuit has held that in light of Dixon, which the Supreme Court decided in 1993, "the performance of a Blockburger analysis completes the judicial task in a successive prosecution case."  United States v. Morris, 99 F.3d 476, 480 (1st Cir. 1996) (citing Dixon, 509 U.S. at 712).

We thus reject Neto's contention that the Due Process Clause of the Fifth Amendment supplements the protections provided by the Double Jeopardy Clause in this case.  Because we analyze the

---

[7]  Although Sattazahn dealt with a challenge to a state-law prosecution under the Fourteenth Amendment's Due Process Clause, "[b]ecause the language and policies of the Due Process Clauses of the Fifth and Fourteenth Amendments are essentially the same, due process cases decided under the Fourteenth Amendment provide guidance in due process cases arising under the Fifth Amendment." United States v. Bohn, 281 Fed. Appx. 430, 434 n.4 (6th Cir. 2008). See also Malinski v. New York, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection."). Cf. S. F. Arts & Athletics, Inc. v. U. S. Olympic Comm., 483 U.S. 522, 542 n.21 (1987) (stating that equal protection analysis is same under Due Process Clause of the Fifth Amendment and Equal Protection Clause of the Fourteenth Amendment).

validity of the indictment solely under the Double Jeopardy Clause, we need only consider whether the Blockburger test is satisfied. Since the test is satisfied, we find no error in the district court's refusal to dismiss the indictment.

**B.  Re-Sentencing**

Because Neto was convicted of three counts of smuggling, he was subjected to a statutory mandatory minimum sentence of five years.  See 8 U.S.C. § 1324(a)(2)(B)(iii).  However, Neto argues that he should be sentenced below the statutory minimum because the government engaged in sentencing factor manipulation.  "Sentencing factor manipulation takes place 'where government agents have improperly enlarged the scope or scale of [a] crime.'"  United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005) (quoting Montoya, 62 F.3d at 3).  When such manipulation occurs, the court has the "power to impose a sentence below the statutory mandatory minimum as an equitable remedy."  Id.  However, a court may impose a sentence below the statutory minimum only if the government engages in "'extraordinary misconduct.'"  Id. at 176 (quoting Montoya, 62 F.3d at 4).

The defendant bears the burden of establishing sentencing factor manipulation by a preponderance of the evidence.  Id. at 180.  The focus of the court's inquiry is "normally upon the conduct of the government rather than the defendant."  United States v. Egemonye, 62 F.3d 425, 427 (1995).  A determination of

whether sentencing factor manipulation exists is a "factbound determination subject to clear-error review." Fontes, 415 F.3d at 181 (quoting United States v. Gibbens, 25 F.3d 28, 30 (1st Cir. 1994)). Because the inquiry is fact-based, "the district court's ultimate judgment whether the government's conduct is outrageous or intolerable is not lightly to be disregarded." Montoya, 62 F.3d at 4.

Here, Neto argues that the government's decision to prosecute the smuggling counts under a separate indictment amounted to "extraordinary misconduct" warranting a sentence below the mandatory minimum. Neto points to the fact that one of the reasons given by AUSA Singh for bringing the second indictment was the government's concern that Neto would receive too light a sentence in Neto I. Neto contends that a desire to achieve a harsher sentence is an improper prosecutorial motive. See Egemonye, 62 F.3d at 428 (stating that undercover agents who conducted a sting operation "went too far if and to the extent that they thought themselves entitled to make up for any shortfall in prior punishments").

Neto also points to our decision in United States v. Saldaña, in which the defendant argued for a downward departure from the guideline range because the United States delayed his federal indictment until after he had completed a state sentence, thus depriving him of the possibility of concurrent sentences. 109

F.3d 100, 102 (1st Cir. 1997).  Although we affirmed the denial of the downward departure in Saldaña, we stated that a case might arise where "a careless or even an innocent delay produced sentencing consequences so unusual and unfair that a departure would be permissible."  Id. at 104.  Neto contends that this is such a case, since the delay between the Neto II indictment and the trial eliminated any possibility of a concurrent sentence.

We find no reason to disturb the district court's conclusion that there was no "extraordinary misconduct" justifying a sentence below the mandatory minimum.  As the court noted, the United States had a number of reasons for its conduct in Neto II that were completely separate from any concern it may have had that Neto would receive too light a sentence in Neto I.  Moreover, we do not believe that it was improper for the government to be concerned that Neto might receive too light a sentence in Neto I.  Although we said in Egemonye that a desire to make up for a "shortfall in prior punishments" was a "dubious motive," we also noted that "the line is thin and blurred" between that desire and a "simple desire to be sure that a committed criminal is caught and tried for a substantial offense based on unshakeable evidence."  Egemonye, 62 F.3d at 428.  Here, AUSA Levenson testified that he viewed the smuggling as "a very serious crime that ought to be reflected in a

sentence."[8]  Because we presume that prosecutors exercise their discretion "in good faith for reasons of sound governmental policy," United States v. Saadé, 652 F.2d 1126, 1135 (1st Cir. 1981), we cannot say that it was improper for the government to treat alien smuggling as a serious crime and to seek punishment commensurate with the seriousness of that crime.

We also find that the delay in sentencing in Neto II does not warrant a reduced sentence under Saldaña.  See 109 F.3d at 104.  In Saldaña, we said that "deliberate tampering to increase a sentence would be a concern, but the ordinary accidents of acceleration or delay are part of the fabric of criminal proceedings."  Id.  However, here there is no evidence of deliberate tampering by the government.  In fact, the delay between the issuance of the Neto II indictment and Neto's sentencing was largely due to Neves' conduct, including his initial flight from justice and his filing of various pretrial motions.

For the reasons discussed above, we find no clear error in the district court's conclusion that there was no sentencing factor manipulation.

## C.  Ineffective Assistance of Counsel

Neto's final argument is that his trial counsel in Neto II was ineffective because he did not ensure that sentencing in

---

[8]  Given that Neto's smuggling scheme involved threatening to kill his employees' family members in Brazil, AUSA Levenson's assessment seems perfectly reasonable.

Neto II took place before the sentence in Neto I expired.  However, this Court "generally will not address ineffective assistance claims on direct appeal, but rather require that they be raised collaterally."  United States v. Rivera-González, 626 F.3d 639, 644 (1st Cir. 2010).  We will consider ineffective assistance of counsel claims on direct appeal "[o]nly when such scrutiny of the factual record is unnecessary because the attorney's ineffectiveness is 'manifestly apparent from the record.'"  Id. (quoting United States v. Wyatt, 561 F.3d 49, 52 (1st Cir. 2009)). Here, evaluating Neto's ineffective assistance claim will require a thorough examination of the timing of various pre-trial events, which is not appropriate at this stage.  Thus, we reject Neto's ineffective assistance claim without prejudice to his reasserting it in a collateral proceeding.  See, e.g., Rivera-González, 626 F.3d at 645.

### III. Conclusion

For the reasons discussed above, we affirm Neto's conviction and sentence.

**Affirmed**.