# United States Court of Appeals
## For the First Circuit

No. 22-1063

UNITED STATES OF AMERICA,

Appellee,

v.

SANTO BENITO LARA, a/k/a Luis Anaya,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Lynch, Thompson, and Gelpí,
Circuit Judges.

Donna J. Brown, with whom Michael G. Eaton and Wadleigh, Starr
& Peters, P.L.L.C. were on brief, for appellant.
Alexander S. Chen, Assistant United States Attorney, with
whom Jane E. Young, United States Attorney, and Seth R. Aframe,
Assistant United States Attorney, were on brief, for appellee.

December 29, 2022

**GELPÍ**, **Circuit Judge**.  Defendant-Appellant Santo Benito Lara ("Benito Lara") was tried and convicted of conspiracy to distribute and to possess with the intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 846.  On appeal, Benito Lara challenges the district court's imposition of a ten-year mandatory minimum sentence, contending that the district court erred when it rejected his sentencing factor manipulation claim. We affirm.

## I. Background

### A. Facts

On May 4, 2018, New Hampshire State Police conducted a traffic stop and discovered 771 grams of methamphetamine and 141 grams of ecstasy (also known as MDMA) concealed within the vehicle.  The driver, Confidential Source 1 ("CS1"), agreed to cooperate with law enforcement and disclosed that in addition to methamphetamine and MDMA, CS1 also dealt heroin and fentanyl.  CS1 admitted to buying half to one kilogram of fentanyl every week from his supplier, "Mamma" -- later identified by law enforcement as Maria Mauras ("Mauras").  That same day, law enforcement directed CS1 to contact Mauras and arrange to purchase seventy-three fingers[1] of fentanyl for approximately $16,000.  Law

_____

[1] A "finger" or "stick" is ten grams of powdered fentanyl sold in compressed, cylindrical packaging.

enforcement then met Mauras at a Target in Salem, New Hampshire, and conducted a buy bust[2] that led to her arrest.

Mauras consequently agreed to cooperate with law enforcement and identified "Louie"[3] -- aka Benito Lara -- as the source of the fentanyl. At agents' request, she contacted Benito Lara and set up a meeting for the following day. Intending said meeting to be another buy bust, agents instructed Mauras to order sixty fingers of fentanyl, or 600 grams. After several telephone conversations between Mauras and Benito Lara about where the transaction would occur, Benito Lara instructed Mauras to meet him at 107 Summer Street in Lawrence, Massachusetts. When Mauras arrived, she could not reach Benito Lara. As a result, law enforcement called off the staged transaction (this is referred to as "the failed buy bust").

After the failed buy bust on May 10, agents switched tactics and began using Mauras for smaller controlled buys -- the first of which occurred on May 30, 2018. That day, Mauras successfully purchased ten fingers, or 100 grams, of fentanyl from Benito Lara. From there, again using Mauras, agents conducted

---

[2] A "buy bust" is when law enforcement engages in the purchase of a controlled substance and the seller is arrested upon the completion of the sale.

[3] During the investigation and trial, Benito Lara was referred to as "Louie Anaya" or "Luis Anaya." Any reference in the record to "Louie," "Luis," or "Anaya" has been changed here to Benito Lara for clarity.

eight additional buys of varying quantities of fentanyl -- ranging from 30 to 100 grams -- from two addresses in Lawrence, Massachusetts -- 83 Walnut Street and 107 Summer Street -- with the final transaction occurring on September 11, 2018.

On October 4, 2018, Benito Lara and his codefendant, Guedin Nivar Baez[4] ("Nivar Baez"), were arrested for conspiracy to distribute fentanyl.[5] The same day, search warrants were executed on 107 Summer Street, Apt. 4H, Lawrence, Massachusetts (Benito Lara's apartment) and 36 Hudson Avenue, 3rd Floor, Lawrence, Massachusetts (a suspected stash house where Nivar Baez would travel between buys).[6] Benito Lara and Nivar Baez were each indicted on one count of conspiracy to distribute and to possess with the intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 846.

---

[4] Nivar Baez was stopped by law enforcement during the investigation and provided a driver's license with the false name "Jhonatan Mateo." Any reference in the record to "Jhonatan" or "Mateo" has been changed here to Nivar Baez for clarity.

[5] During the investigation, Nivar Baez was identified as Benito Lara's drug runner. A drug runner is a person who transports controlled substances to the location where the transaction is set to occur. They are often used to insulate the dealer from police investigation or to prevent drug rip-offs.

[6] Although seven of the nine controlled buys occurred at 83 Walnut Street, Lawrence, Massachusetts, the transactions occurred immediately inside the doorway. Law enforcement did not believe they could obtain a search warrant for 83 Walnut Street based on that evidence because the property is not a single-family residence.

## B. Procedural History

After a four-day jury trial, Benito Lara was found guilty of conspiracy to distribute and to possess with the intent to distribute fentanyl.[7]  In advance of sentencing, the probation officer submitted a presentence investigation report ("PSR") that Benito Lara successfully objected to three aspects of: (1) the drug quantity calculation, (2) an upward adjustment for maintaining drug distribution premises, and (3) an upward adjustment for being an organizer or leader in the criminal activity.[8]  After accounting for the sustained PSR objections, Benito Lara's Guidelines sentencing range was 97 to 121 months, and he faced a ten-year mandatory minimum.

Benito Lara, however, also raised a claim of sentencing factor manipulation and sought an equitable downward departure from the mandatory minimum sentence.  The district court held a second sentencing hearing on November 4, 2019, and concluded that based on the original and supplemental briefings, Benito Lara had not met his burden of establishing sentencing factor manipulation but live testimony from the investigating agents was needed to

---

[7] Nivar Baez pled guilty and was sentenced to fifty-two months of imprisonment.

[8] The district court declined to attribute the 700 grams of fentanyl sold by Mauras on May 4, 2018, at Target to Benito Lara. Additionally, the government agreed to striking the two-level adjustment for Benito Lara being a leader or manager.

conclusively decide the issue. As a result, United States Drug Enforcement Administration Agent John Daly ("Agent Daly") and Task Force Officer Robert Lukacz ("TFO Lukacz") testified about their knowledge of federal sentencing, specifically mandatory minimums, and detailed any direction received from superiors about how to conduct their investigation. They were questioned extensively about their motivations for investigating Benito Lara and their justifications for the strategies employed. On January 10, 2022, the district court denied Benito Lara's request for a departure from the mandatory minimum sentence, citing his failure to prove the existence of sentencing manipulation, and sentenced him to 120 months of imprisonment (the mandatory minimum). This timely appeal followed.

## II. Standard of Review

We review a district court's determination of whether sentencing factor manipulation occurred for clear error. United States v. Gibbens, 25 F.3d 28, 30 (1st Cir. 1994) (categorizing manipulation decision as "factbound"). "A [district court's] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395

(1948); see United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004) (same).

### III. Discussion

Sentencing factor manipulation occurs "where agents have improperly enlarged the scope or scale of the crime." United States v. Montoya, 62 F.3d 1, 3 (1st Cir. 1995). A defendant bears the burden of proving sentencing manipulation by a preponderance of the evidence, United States v. Gibbens, 25 F.3d at 31-32, and cannot prevail "simply by showing that the idea originated with the government[,] . . . that the conduct was encouraged by it, or that the crime was prolonged beyond the first criminal act, or exceeded in degree or kind what the defendant had done before." Montoya, 62 F.3d at 3-4 (citations omitted) (explaining "garden variety" claims of sentencing manipulation inevitably fail). Because "there is an element of manipulation in any sting operation," United States v. Connell, 960 F.2d 191, 194 (1st Cir. 1992), a defendant must establish "extraordinary misconduct" by the government to obtain a sentencing reduction. Montoya, 62 F.3d at 4 (quoting Gibbens, 25 F.3d at 31). As Montoya explains, "[t]he standard is high because we are talking about a reduction at sentencing, in the teeth of a statute or guideline approved by Congress, for a defendant who did not raise or did not prevail upon an entrapment defense at trial." Id. (emphasis added). Additionally, "[t]he standard is general because it is designed

- 7 -

for a vast range of circumstances and of incommensurable variables." Id.; see Gibbens, 25 F.3d at 31 (declining to create bright line rule and instead requiring individualized assessment of manipulation claims). Our case law makes clear that "sentencing factor manipulation is a claim only for the extreme and unusual case." See Montoya, 62 F.3d at 4 (emphasis added).

When a sentencing factor manipulation claim is raised, a district court's primary inquiry should be "the government's conduct and motives" in deciding whether "extraordinary misconduct" occurred. See Gibbens, 25 F.3d at 31; United States v. Jaca-Nazario, 521 F.3d 50, 58 (1st Cir. 2008). "Extraordinary misconduct" may take the form of an "illegitimate motive on the part of the agents" or "outrageous or intolerable pressure" from government actors on the accused. See Montoya, 62 F.3d at 4. Because a finding of "extraordinary misconduct" is deeply intertwined with the facts, we extend deference "even to the district court's conclusion about whether or not the government has behaved outrageously or intolerably." Jaca-Nazario, 521 F.3d at 57. Further, any purported illicit motive must be actions taken out of "malice or bad faith." United States v. Capelton, 350 F.3d 231, 246 (1st Cir. 2003). If any government misconduct is found, the court's secondary inquiry should be the defendant's predisposition to commit the crime. Jaca-Nazario, 521 F.3d at 58-59 (explaining defendant's predisposition is secondary because

with guilt already established, only degree of criminality is at issue); see Gibbens, 25 F.3d at 31 n.3 (acknowledging potential relevance of predisposition evidence when evaluating government conduct or motives); United States v. Fontes, 415 F.3d 174, 183 (1st Cir. 2005) (affirming consideration of predisposition evidence in determining whether the government's conduct was "extreme and outrageous"). If manipulation is found, a "sentencing court has ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the [Guidelines sentencing range]." Connell, 960 F.2d at 196; see Montoya, 62 F.3d at 4 (stating departure for sentencing factor manipulation is permitted even where mandatory minimum applies).

On appeal, Benito Lara faces an uphill battle given the high standard for sentencing manipulation claims and the deference afforded to the district court's "factbound" determinations. Nevertheless, he contends that the record demands finding sentencing factor manipulation and, consequently, a sentence below the ten-year mandatory minimum. Benito Lara marshals many facts to claim that law enforcement improperly expanded the scope of his crime, and although not so explicitly stated, we understand that he advances two theories: (1) Law enforcement acted with an improper investigative motive in extending their investigation until Benito Lara sold threshold quantity amounts of fentanyl, and

- 9 -

(2) Benito Lara was not predisposed to selling large quantities of fentanyl, but his will was overborn by law enforcement. We address each in turn.

## A. Law Enforcement Improper Motive Claim

First, Benito Lara argues that law enforcement's investigation was motivated by a desire to turn him into the "big fish" that Mauras promised them. He argues that the May 10 failed buy bust establishes that agents knew he was a street-level dealer and ignored critical evidence that they were moving "down the chain." He further claims that, when agents were unable to arrest him for selling 600 grams of fentanyl, they conducted nine smaller controlled buys until he sold over 400 grams -- the ten-year mandatory minimum threshold -- thus acting upon an improper motive.

It is settled law that the government does not impermissibly enlarge a sentence simply by inviting the defendant to engage in multiple drug sales, as opposed to arresting him after the first sale. See Capelton, 350 F.3d at 246 (emphasizing sentencing manipulation requires government to act out of "malice or bad faith"). As such, the government engaging Benito Lara in nine controlled buys alone does not constitute sentencing factor manipulation.

Nor does Benito Lara establish that the government acted in bad faith or based on an improper motive. The district court

- 10 -

accepted as credible the testimony of Agent Daly and TFO Lukacz, who were both subjected to extensive cross examination. Therefore, we summarize below the evidence before the district court when it reached that conclusion.

Per Agent Daly, the May 10 buy bust likely failed because Benito Lara was spooked by the change in pattern following the Target bust: Mauras not returning with the cash on May 4, being out of touch for days, and then attempting to get him to go to a new location on May 10 where deals had never previously occurred. Law enforcement switched to smaller quantities after the failed buy bust to reestablish Benito Lara's trust in Mauras. Additionally, as justification for continuing to investigate Benito Lara, Agent Daly explained that despite the failed buy bust, he still believed Benito Lara could obtain a large quantity of drugs because, outside of Mauras identifying him as her source, she was surveilled going to 107 Summer Street immediately before the Target buy bust. Agent Daly also testified that during the window from May 10 to May 30, he met with Mauras and received new information prompting an investigation into the broader drug trafficking organization ("DTO") that Benito Lara was believed to be a part of. Further, law enforcement only learned that Benito Lara used a drug runner during the first successful buy on May 30. Both agents testified that the additional controlled buys were motivated by a desire to gather evidence, get the DTO's pattern of

- 11 -

operation down, positively identify Benito Lara and the drug runner, Nivar Baez, locate potential stash houses for drugs or cash, and develop probable cause for search warrants of the three involved properties, particularly 107 Summer Street where Mauras had observed drugs and where the failed buy bust was supposed to occur.

As we have previously stated, "[i]f . . . a judge's finding is based on witness credibility, that finding, 'if not internally inconsistent, can <u>virtually never be clear error</u>.'" <u>United States</u> v. <u>Rivera-Carrasquillo</u>, 933 F.3d 33, 42 (1st Cir. 2019) (quoting <u>Anderson</u> v. <u>City of Bessemer</u>, 470 U.S. 564, 575 (1985)). Here, Agent Daly and TFO Lukacz provided justifications for the change in strategy and continued investigation that are facially reasonable. Nevertheless, Benito Lara claims that internal factual inconsistencies exist which undermine the agents' credibility.

Benito Lara asserts that law enforcement's justifications for the length of the investigation are nothing more than "backward rationalizations" that demonstrate the government's lack of good faith. He posits that all the evidence law enforcement needed to arrest and obtain search warrants was known by May, or at the latest, July; yet, agents continued the controlled buys until September when he was comfortably over the 400-gram mandatory minimum threshold. Further, he alleges that

law enforcement failed to meaningfully investigate the DTO or gather additional evidence, undermining one of law enforcement's main justifications for extending the investigation until September. Despite Benito Lara's assertions, TFO Lukacz testified that law enforcement could not obtain a search warrant for 107 Summer Street until they knew Benito Lara's apartment number -- a statement credited by the district court -- because buys did not occur there again until August 2018 and Mauras, although able to describe the apartment's interior in detail, did not know the apartment number within the "carved up tenement." Once law enforcement obtained the apartment number following the final buy on September 11, the controlled buys stopped. TFO Lukacz also testified as to investigative steps, unfruitful as they may have been, that were taken to develop evidence in addition to controlled buys with Benito Lara: surveillance, phone record analysis, and controlled buys with another potential DTO member.

Here, the district court took great care in considering Benito Lara's sentencing manipulation claim -- receiving substantial briefing, as well as live testimony from the agents about why the investigation was prolonged. The district court questioned officers directly about their investigative motives and the evidence the investigation produced. We see nothing "internally inconsistent" in the district court crediting the agents' testimony when it was not contradicted by "documents or

objective evidence," Anderson, 470 U.S. at 575, but merely by Benito Lara's differing interpretation of the facts. The government's good faith justifications for the length of the investigation, accepted by the district court, are "at least as plausible" as the improper motive attributed to law enforcement by Benito Lara. See Gibbens, 25 F.3d at 32. Because "[w]e have held, time and again, that when a sentencing court is confronted with two reasonable views of the record, and chooses to credit one such view rather than the other, its choice cannot be termed clearly erroneous," id., we affirm the district court's rejection of Benito Lara's sentencing factor manipulation claim. The district court did not clearly err when it found that Benito Lara failed to establish an improper government motive.

## B. Excessive Government Pressure Claim

Second, Benito Lara contends that law enforcement used "excessive pressure" to overbear his will since he was only predisposed to committing lesser crimes -- in other words, selling smaller quantities of fentanyl. But none of his contentions persuade us.

In support of his excessive pressure claim, Benito Lara, argues that because Mauras entered into such a favorable deal with his alleged boss, Julio Perez ("Perez"), Benito Lara had no choice but to provide Mauras drugs and collect the proceeds to send to Perez. Unfortunately for Benito Lara, he raises this argument for

the first time on appeal -- a point the government made in its brief and Benito Lara left uncontradicted when he failed to file a reply brief. "[A]bsent extraordinary circumstances counseling for exception, we routinely deem waived arguments not timely presented before the district court." Butler v. Deutsche Bank Tr. Co Ams., 748 F.3d 28, 36 (1st Cir. 2014). Because Benito Lara never convincingly explains how his situation fits the extraordinary-circumstances exception, we decline to entertain his Perez argument for the first time on appeal.

By way of further example, Benito Lara also asserts that law enforcement overbore his will because he was not someone who had previously dealt in "very substantial quantities." He cites his single prior arrest for selling 10 grams of fentanyl and modest lifestyle -- living in a small, minimally furnished attic room and possessing a flip phone -- as evidence that he was only predisposed to being a low-level street dealer. But the record does not bear out his suggestion. As the government notes -- with no contradiction from Benito Lara -- he sold Mauras fentanyl nine separate times, including 100 grams on three occasions and 50 grams on three occasions. Any one of those transactions (notably, the first controlled buy conducted in this investigation) would have been sufficient to subject Benito Lara to a five-year mandatory minimum sentence, see 21 U.S.C. § 841(b)(1)(B)(vi), belying his assertion that he only sold

threshold quantities of fentanyl after being subjected to excessive pressure from law enforcement. We see no clear error here either.

## IV. Conclusion

For the foregoing reasons, the district court's judgment is **<u>affirmed</u>**.